# United States Court of Appeals
## For the First Circuit

No. 12-2145

MYRNA COLÓN-MARRERO,

Plaintiff, Appellant,

v.

HÉCTOR J. CONTY-PÉREZ, President of the Puerto Rico State
Elections Commission (SEC); EDWIN MUNDO-RÍOS, as Electoral
Commissioner of the New Progressive Party (NPP);
EDER E. ORTIZ-ORTIZ, as Electoral Commissioner of the
Popular Democratic Party (PDP); ROBERTO I. APONTE-BERRÍOS, as
Electoral Commissioner of the Puerto Rican Independence Party
(PIP); JULIO FONTANET-MALDONADO, as Electoral Commissioner
of the Movimiento Unión Soberanista (MUS); ADRIÁN DÍAZ-DÍAZ,
as Electoral Commissioner of the Puertorriqueños por
Puerto Rico (PPR); and CARLOS QUIRÓS-MÉNDEZ, as Electoral
Commissioner of the Partido del Pueblo Trabajador (PPT),

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen Consuelo Cerezo, U.S. District Judge]

Before

Torruella, Lipez and Howard,
Circuit Judges.

Carlos A. Del Valle-Cruz, with whom Rafael E. García-Rodón and
Carlos Hernández-López, were on brief for appellant.
Jorge Martínez-Luciano, with whom Pedro E. Ortiz-Álvarez, LLC,
was on brief for appellee Eder E. Ortiz-Ortiz.
David C. Indiano, with whom Seth A. Erbe and Indiano &
Williams, P.S.C., were on brief for appellee Edwin Mundo-Ríos.
Nelson N. Córdova-Morales, with whom Córdova Morales Law

Offices, was on brief for appellee Adrián Díaz-Díaz.

José L. Nieto-Mingo, with whom Nieto Law Offices, was on brief for appellee Héctor J. Conty-Pérez.

Jessica Dunsay Silver, Principal Deputy Chief, and Sasha Samberg-Champion, Attorney, Appellate Section, Civil Rights Division, United States Department of Justice, on brief for amicus curiae, the United States.

Francisco J. González-Magaz, on brief for amicus curiae Francisco R. González-Colón.

---

November 2, 2012

---

**Per Curiam**. Plaintiff is an otherwise qualified voter in Puerto Rico who has been removed from the voter registration roll because she did not vote in the 2008 general election, pursuant to Article 6.012 of Puerto Rico Law No. 78.[1] She seeks a preliminary injunction to redress that removal. On October 18, 2012, we affirmed the denial of an injunction that would have required the government to reinstate more than 300,000 voters to the registration roll in time for the upcoming federal election on November 6. The record and the parties' arguments failed to demonstrate that such extraordinary relief could be granted only weeks before the election without creating uncertainty and confusion in the Puerto Rico electoral process. Although we recognized the importance of plaintiff's claims, we declined to jeopardize the electoral process as a whole by acting precipitously on evolving claims that had not yet been adequately analyzed or developed by plaintiff. Hence, we affirmed the district court's denial of a preliminary injunction. We now explain that decision more fully and remand for further proceedings consistent with this opinion.

---

[1] Two plaintiffs initially filed this action in the district court, but only one appeals. Plaintiff brings a facial challenge to Article 6.012, requesting equitable and declaratory relief under 42 U.S.C. § 1983. Though plaintiff did not seek class certification, her requested relief would have applied to all similarly situated voters. See City of Chicago v. Morales, 527 U.S. 41, 55 (1999) ("When asserting a facial challenge, a party seeks to vindicate not only his own rights, but those of others who may also be adversely impacted by the statute in question.").

Plaintiff filed this suit on September 12, 2012, claiming that federal law prohibited the Commonwealth government from removing her from the voting roll for the upcoming election of Puerto Rico's only elected federal officer, the Resident Commissioner. She alleged that Article 6.012 was unlawful under both the National Voter Registration Act ("NVRA") and Section 303(a)(4)(A) of the Help America Vote Act of 2003 ("HAVA"), 42 U.S.C. § 15483(a)(4)(A).[2] The district court denied plaintiff's request for a preliminary injunction. Plaintiff immediately filed an appeal, and after nearly two hours of oral argument during a special session of this court on October 11, we concluded that plaintiff had shown a likelihood of success on the merits of her claim.

However, the panel also determined that serious factual questions remained as to the balance of harms and the public interest in ordering the immediate reinstatement of the more than 300,000 voters who had been stricken from the registration roll.[3] The parties offered competing assertions on the feasibility of granting plaintiff's requested relief. Given that no evidentiary

---

[2] Unlike Article 6.012, which allows a voter to be deactivated after failing to vote in one election, both the NVRA and HAVA allow deactivation only after a failure to vote in two consecutive elections. See 42 U.S.C. § 1973gg-6(b)(2)(B) & 42 U.S.C. § 15483(a)(4)(A).

[3] These deactivated voters are known as "I-8" voters.

hearing had been held in the district court, we had "no basis for assessing the validity of the parties' factual claims." We thus retained jurisdiction while remanding the case to the district court for fact-finding, forthwith, on the feasibility of reinstating the affected voters in time for the November 6 election.

The district court heard nearly sixteen hours of testimony during an evidentiary hearing on October 15 and 16. Both sides presented several witnesses who testified to the availability of extra ballots and other electoral materials, the number of available polling places, training requirements for extra poll workers, and the availability of additional volunteer poll monitors. On October 17, the district court certified its findings. In these findings, the court (1) concluded that it would be feasible to allow the I-8 voters to vote in the general election so long as this court ordered such relief by Tuesday, October 23, (2) expressed no opinion on whether it would be feasible to reactivate the I-8 voters only for the federal portion of the election, i.e., for the position of Resident Commissioner, and (3) indicated that this court would need to craft a same-day recusal procedure to reduce both the risk of reactivated I-8 voters casting

votes in the incorrect precinct and the risk of fraudulent votes cast by I-8 voters who were no longer residents of Puerto Rico.[4]

## II.

Our view is that the NVRA by its terms does not apply to Puerto Rico, and it therefore cannot provide any relief for plaintiff in this case. Although the statute does not explicitly exclude Puerto Rico from its scope, the statutory language and legislative history reveal Congress's intent to do so.[5] Section 1 defines "State" as "a State of the United States and the District of Columbia." 42 U.S.C. § 1973gg-1(4). The express inclusion of one non-state jurisdiction is telling evidence that other such jurisdictions were intentionally excluded. Similarly, while Congress adopted in the NVRA the definition of "election" and "Federal office" from the Federal Election and Campaign Act of 1971

---

[4] The court found the expert testimony of Professor Héctor Luis Acevedo to be particularly compelling. Acevedo stated that, because extra ballots already existed and additional polling places were available, preparations could be made to accommodate the 330,902 deactivated voters if the order to do so were given at least ten to twelve days before the election.

[5] Thus, the so-called "default rule" invoked by our dissenting colleague does not apply here. The rule derives from 48 U.S.C. § 734, which provides that federal laws "not locally inapplicable . . . shall have the same force and effect in Puerto Rico as in the United States." The rule does not come into play, however, where Congress manifests an intent to exclude Puerto Rico from a law's coverage. See United States v. Acosta-Martinez, 252 F.3d 13, 18 (1st Cir. 2001) (stating that the role of the federal court in determining a federal statute's applicability to Puerto Rico is "restricted to determining [congressional] intent" if such intent can be discerned).

("FECA"), see 42 U.S.C. § 1973gg-1(1), (2), the NVRA definition of "State" departs from FECA's. FECA defines "State" as "a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or a territory or possession of the United States." 2 U.S.C. § 431(12) (emphasis added). In light of its use of other FECA definitions, Congress's rejection of the broad definition of "State" evidences a deliberate decision to more narrowly define that term in the NVRA.[6]

The NVRA's legislative history points in the same direction. An early version of the statute adopted FECA's definition of "State," which expressly includes Puerto Rico. See H.R. No. 101-396 (1990) (adopting the definition of State in § 431 of FECA). This definition was later replaced, however, with the current version limiting "State" to the United States and the District of Columbia. See H.R. Rep. No. 103-66 (1993) (Conf. Rep.), reprinted in 1993 U.S.C.C.A.N. 140, 140. Moreover, when discussing the NVRA before its passage, several members of Congress indicated their understanding that the territories, including Puerto Rico, would not be covered by the statute's definition of "State." For example, New York Representative Solomon observed

---

[6] It is true, as the dissent points out, that the NVRA's definition of "Federal office," also adopted from FECA, includes Resident Commissioner -- an office that exists only in Puerto Rico. See 2 U.S.C. § 431(3). Given the multiple indications that Congress did not intend "State" to include Puerto Rico, however, the inclusion of Resident Commissioner as a "Federal office" is but one contrary signal in an otherwise consistent set of factors.

-7-

that "this piece of legislation . . . mandates a cost on all 50 States, but not on the territories . . . because the territories are not included."  139 Cong. Rec. H504 (daily ed. Feb. 4, 1993); see also id. at S5739-01 (daily ed. May 11, 1993) (statement of Sen. Helms)("[T]his conference will cost the States, all 50 of them . . . millions of dollars[.]"); id. at S2913 (daily ed. March 16, 1993) (statement of Sen. Chafee) ("[This bill] requires all 50 states to adopt uniform, federally mandated voter registration practices.").[7]

The textual signals and the legislative history, taken together, constitute persuasive evidence that Congress did not intend to include Puerto Rico as a "State" under the NVRA.  Despite plaintiff's failure to establish a likelihood of success on the merits of her NVRA claim, however, we determined that she successfully made such a showing on the merits of her claim under Section 303(a)(4)(A) of HAVA that she has a right to vote for Resident Commissioner.  The express inclusion of Puerto Rico within HAVA's definition of "State," see 42 U.S.C. § 15541, together with a sensible reading of that statute's relevant substantive provision, see id. § 15483(a)(4)(A),[8] persuaded us that plaintiff

---

[7] The Department of Justice also takes the position that the NVRA does not extend to Puerto Rico.  See Dep't of Justice Letter Brief, Oct. 10, 2012.

[8] Our dissenting colleague appears to rely on HAVA in construing the meaning of "State" in the NVRA.  HAVA was enacted nearly a decade after the NVRA, and it thus cannot provide insight

-8-

had established a likelihood of success on her federal election claim under HAVA. By contrast, it is an open and difficult question -- one not addressed by plaintiff -- whether HAVA would provide a basis for a federal court ordering the reinstatement of voters in Commonwealth elections. To the extent that the language of the October 11 order suggested that our determination also extended to plaintiff's right to vote in Puerto Rico's local elections, that language did not and does not reflect the view of the majority.

Our view of the scope of the relief at issue was informed by the argument advanced by plaintiff in the district court and on appeal. Plaintiff had repeatedly asked the district court and this court only to "immediately activate her and all other[] similarly situated persons as registered voters in the general registry of voters entitled to vote in the upcoming election for Resident Commissioner." Colón-Marrero v. Conty-Pérez, No. 12-cv-01749-CCC, at 3 (D.P.R. Sept. 18, 2012) (order denying preliminary injunction) (emphasis supplied). The broader question of a right to vote for local Puerto Rico offices and in the plebiscite in the upcoming election was raised by plaintiff for the first time before us in her supplemental briefing to this court following the district court's fact-finding.

---

into Congress's intent with respect to the earlier statute.

Plaintiff was fully aware of the limited nature of her original request. Indeed, Judge Cerezo wisely brought the distinction between the right to vote for the Resident Commissioner and the right to vote on every ballot in the general election to the parties' attention at the outset of the hearing on October 15. Thus, despite the language in the order of October 11, it would have been prudent for plaintiff to fully develop evidence concerning the feasibility of both potential remedies – voting only for the Resident Commissioner (the relief originally sought) or voting in the election generally (the relief now sought). Yet plaintiff elicited scant evidence at the evidentiary hearing specifically about the feasibility of reinstating the I-8 voters solely for the purpose of voting for the Resident Commissioner. As a result, the district court made no finding on the feasibility of reinstating the I-8 voters only for the Resident Commissioner election. That feasibility was a major concern for the majority because the candidates for both Resident Commissioner and Governor appear on the same ballot.

We also had concerns about the absence of same-day recusal procedures, an issue noted by the district court. While Professor Acevedo testified that there were sufficient materials and personnel available to successfully reinstate the I-8 voters for the November 6 general election, he pointed out that Puerto Rico law does not include a process by which poll watchers can

-10-

challenge the validity of a voter's claim to residency on the day of the election. According to the testimony of several witnesses, establishing that the I-8 voters are residents of the precinct in which they seek to vote is necessary because the I-8 voters have not updated their voter information since before the November 2008 general election. It is therefore safe to assume that at least some of them now reside in different precincts than they did in 2008, while others may no longer be residents of Puerto Rico at all. In addition, a recusal mechanism on the day of the election would address the fact that the I-8 voters would be added to the registration roll without the voter review ordinarily conducted under Commonwealth law early in an election year. Even if it were appropriate for a federal court to prescribe alternative recusal procedures, we would be ill equipped to do so in the short time remaining before the election.

Moreover, beyond the concerns about our authority and competency to craft recusal procedures, we note our global concern with plaintiff's delay in bringing this action. Although the particular statute under which the defendants acted, Article 6.012 of Puerto Rico Law No. 78, was enacted only last year, the procedures that plaintiff challenges have existed in some form since at least the 1970s. Additionally, HAVA itself was adopted nearly a decade ago, and two federal election cycles have been completed since then. Yet plaintiff did not file her complaint

until September 12, 2012, less than two months before a general election that had long been scheduled for November 6.

Thus, plaintiff here is in a similar position to the plaintiffs in Respect Maine PAC v. McKee, 622 F.3d 13 (1st Cir. 2010), who also sought to challenge long-standing election laws in the weeks leading up to an election. We held there that the plaintiffs' claims of irreparable harm were undermined by the fact that their "'emergency' [was] largely one of their own making." Id. at 16. Here, as well, on the eve of a major election, plaintiff seeks to disrupt long-standing election procedures, which large portions of the electorate have used. Indeed, more than 200,000 voters who were deactivated for failing to vote in 2008 reactivated themselves and will be qualified to fully participate in the upcoming general election. Plaintiff herself had ample opportunity to reactivate her voting status. Under the current reactivation procedures, plaintiff could have reactivated herself by appearing in person at her local election commission office, a process that one witness testified can be completed "practically within minutes." What is more, plaintiff's own expert witness Professor Acevedo testified that the election commission published notices in local newspapers urging qualified voters to reactivate.

In sum, for the reasons stated, we concluded in our order of October 18 that it would be improvident to grant plaintiff's requested relief with only eighteen days remaining before the

general election.  Hence, we denied plaintiff's request for a preliminary injunction.[9]  We now remand the case to the district court for further proceedings consistent with this opinion.

So ordered.

**-Dissenting Opinion Follows-**

---

[9] We are not alone in holding that even where plaintiff has demonstrated a likelihood of success, issuing an injunction on the eve of an election is an extraordinary remedy with risks of its own.  Indeed, the Supreme Court has stated that "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls."  Purcell v. Gonzalez, 549 U.S. 1, 4-5 (2006). Similarly, in Sw. Voter Registration Educ. Project v. Shelley, 344 F.3d 914 (9th Cir. 2003) (en banc) (per curiam), the Ninth Circuit concluded that plaintiffs had demonstrated a "possibility of success" on their claim under the Voting Rights Act, but concluded that on the eve of the election, there was no way to grant plaintiffs relief without causing significant harm to the general public.

**TORRUELLA**, <u>Circuit Judge</u> **(Dissenting).** I respectfully express my profound dismay with what I consider to be the majority's 180-degree change of direction from, and disavowal of, the unanimous October 11, 2012 order to the district court. Nevertheless, I see little to be gained from engaging in ex post facto arguments regarding its content. It is what it is, and no amount of parole discussion will alter its text. The best evidence of what the panel actually agreed to is the order itself:

> Having heard argument and <u>carefully reviewed the record and the parties' filings</u>, we are of the view that plaintiff-appellant has demonstrated a likelihood of success on the merits of her challenge to Art. 6.012 . . . We also conclude that plaintiff-appellant has made the requisite showing of the potential for irreparable harm, her inability to vote in the upcoming Puerto Rico <u>general election</u>, if the preliminary relief requested is denied. With respect to the third and fourth factors to be weighed in considering a motion for preliminary injunction, the balance of harms and the effect of the decision on the public interest, we find that the record is insufficiently developed on the factual issues. On appeal, the parties have made widely differing claims with respect to the feasability of granting the request for preliminary relief, specifically of permitting the voters who have been inactivated for failure to vote in the 2008 elections to vote in the <u>general election</u> on November 6, 2012. As an appellate court, and in the absence of an evidentiary hearing in the district court, we have no basis for assessing the <u>validity of the parties' factual claims</u>.

<u>Colón-Marrero</u> v. <u>Conty-Pérez</u>, No. 12-2145 (1st Cir. Oct. 11, 2012)(order remanding case to the district court for an evidentiary

hearing)(emphasis supplied). The underlined text indicates that the panel carefully considered the record and what the parties were claiming, that it deemed Plaintiff-Appellant's claim to relate to her inability to vote at the general election, a term used twice in the order, and that the case was being remanded to the district court for the purpose of receiving evidence on the factual claims relating to the third and fourth factors of the preliminary injunction criteria: the balance of harms and the effect of the decision on the public interest. The order unambiguously states that the panel deemed the first two factors, likelihood of success on the merits and irreparable harm, both of which are legal determinations, to have already been established.

It is within those parameters that we ordered the fact finding hearing to be held before the district court, and further, it is to develop the record as to those two factors that the district court produced its findings of fact. These findings, based on the evidence adduced at the hearing, resulted in a certification that it was feasible to allow the voters stricken from the lists to vote in the forthcoming general elections, if certain attainable processes were immediately put into effect. See Findings Certified to the Court of Appeals, Colón-Marrero v. Conty-Pérez, No. 12-cv-1749 (D.P.R. Oct. 17, 2012)("In sum, the Acevedo proposal meets all feasibility requirements.").

Notwithstanding these factual findings, and the legal conclusions contained in our order of October 11, 2012, upon return of the matter to this Court, a majority of the original panel, without giving any explanation whatsoever as to its change of course, "concluded that serious feasibility issues preclude[d] the entry of the relief sought by plaintiff-appellant." Colón-Marrero v. Conty-Pérez, No. 12-2145 (1st Cir. Oct. 18, 2012)(order denying preliminary injunction). This action was taken without any reference to the requirements of Fed. R. Civ. P. 52(a)(2), and in clear violation of its mandate. See id. ("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses."). See also Constructora Mazda v. Banco de Ponce, 616 F.2d 573, 576 (1st Cir. 1980)(the clearly erroneous rule applies in all nonjury cases "not only when the district court's findings are based upon its assessment of conflicting testimony, but also when as here, much of the evidence is documentary and the challenged findings are factual inferences drawn from undisputed facts").

Our October 11 order is the law of this case, and should have been set aside only if the panel majority found it to be "clearly erroneous" and to have resulted in "a manifest injustice." Pepper v. United States, 131 S. Ct. 1229, 1250-51 (2011)(internal

-16-

citations omitted). Of course, no such finding was made because the record would not credibly support it.

The importance of the findings of fact by the trial court in this case, and the innate wisdom of Fed. R. Civ. P. 52(a)(2) in a situation such as was presented to us, are of particular relevance because the nuances that are evident to an experienced magistrate with local knowledge, such as Judge Cerezo, are not apparent, and are most likely lost, to an appellate court relying solely on a cold record, sitting thousands of miles away from the scene of a developing scenario. Thus, the findings of the trial court in the present case should have been given particular deference, even more so by the standard of Fed. R. Civ. P. 52.

I shall not further dwell on this point, but choose to go to the merits of this controversy, which I believe should have strongly favored Plaintiff-Appellant had justice prevailed in this case.

In my opinion, after the district court's findings were extant, the requirements of Planned Parenthood League v. Bellotti, 641 F.2d 1006, 1009 (1st Cir. 1981), were met and a preliminary injunction should have been issued. See id. (setting forth the standards for the issuance of a preliminary injunction). I shall briefly explore seriatim each of the four factors established in Planned Parenthood:

**(1) The likelihood of success on the merits**

As was recently stated by the same panel that is now ruling on the present case, "[i]n the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis." Sindicato Puertorriqueño de Trabajadores v. Fortuño, No. 12-2171, slip op. at 17 (1st Cir. Oct. 19, 2012)(citing Elrod v. Burns, 427 U.S. 347, 373 (1976)).

In this appeal, the central issue relating to this requirement is a determination of the applicability of two federal statutes to the Puerto Rican electoral processes, namely, the National Voter's Registration Act of 1993 ("NVRA"), 42 U.S.C. §§ 1973gg-1973gg-10, and the Help America Vote Act of 2002 ("HAVA"), 42 U.S.C. §§ 15301-15545. Both of these statutes require, among other things, that state and local governments not remove voters from active voter lists until after they decline to vote in at least two consecutive elections for Federal office. See 42 U.S.C. § 1973gg-6(b) & § 15483(a)(4).

These statutes apply to Puerto Rico. By virtue of section 3(2) of the NVRA, 42 U.S.C. § 1973gg-1(2), the term "Federal office" shall have the same meaning it has in section 301(3) of the Federal Election Campaign Act of 1971 ("FECA"), 2 U.S.C. § 431(3). Pursuant to section 301(3) of FECA the term "Federal office" includes, "the office of . . . Resident Commissioner to, the Congress." Id. The only jurisdiction of the

United States in which this office exists is in the Commonwealth of Puerto Rico. See 42 U.S.C. § 891.

The NVRA, however, does not expressly mention Puerto Rico within its definition of "State." See id. § 1973gg-1(4).[10] As will be further explained infra, that does not have the effect of making the statute inapplicable to Puerto Rico. Most importantly, neither does it nullify the express inclusion within its scope of elections for the office of Resident Commissioner made by virtue of its clear reference to section 301(3) of FECA.

Conversely, HAVA, which was enacted almost ten years after the NVRA, expressly includes Puerto Rico in its definition of "State." See id. § 15541. Section 303 of HAVA prescribes the requirements that must be met by the voter registration systems used by the states in elections where a Federal office is at stake. Among said prescriptions is the prohibition of removal from voter registration lists until after the voter declines to vote in two consecutive elections for Federal office. Plaintiff-Appellant seeks to enforce this proscription against the Commonwealth's conflicting disenfranchisement provision. See id. § 15483(a)(4). Section 303 of HAVA also incorporates the NVRA's provision regarding elimination of voters from voter registration lists for not voting. See 42 § 15483(a)(2)(A)(i). Given that these provisions prescribe the way Puerto Rico must keep its voter

_____

[10] Neither does it expressly exclude it.

-19-

registration rolls for elections for Federal office, and that Puerto Rico, like many states, has a single voter registration system -not two- these provisions necessarily regulate the registration lists for the general elections in Puerto Rico, which always include the election for the Resident Commissioner as an integral part of the general election process.  See American Civil Liberties Union v. Santillanes, 546 F.3d 1313, 1325 (10th Cir. 2008)("HAVA applies to all elections that include election to federal offices.")(emphasis supplied); Crowley v. Nevada ex rel. Nevada Secretary of State, 678 F.3d 730, 735 (9th Cir. 2012)(same).

Furthermore, HAVA also provides that, as a condition to receiving Federal funding pursuant to its provisions, states must draft and submit "State plans" and detail how they meet the requirements of subchapter III of HAVA, which includes the prohibition at issue here.  See id. §§ 15401(b), 15483(a)(2)(A)(i) & (a)(4)(A).  The record reflects that the Commonwealth has been the recipient of these funds and that it has used them to comply with some provisions of subchapter III of HAVA, but has chosen to opt out of other provisions of the same subchapter, such as the prohibition involved in this case.  See Puerto Rico's Plan for Implementation, Plaintiff-Appellant's Br., Add. A, at 46-50.

As stated above, the NVRA expressly includes in its definition of Federal office the office of "Resident Commissioner," but fails to specifically mention Puerto Rico in its definition of

"State."  I believe this omission does not nullify the express intent of Congress to include within the scope of the NVRA the office of Resident Commissioner, an office for which elections are only held in Puerto Rico.

Even if we were to attribute significance to the omission in question, the special interpretive default rule that has evolved over time in the First Circuit pursuant to Section 9 of the Puerto Rican Federal Relations Act, 48 U.S.C. § 734 ("[t]he statutory laws of the United States not locally inapplicable . . . shall have the same force and effect in Puerto Rico as in the United States"), unequivocally mandates the application of the NVRA and HAVA to the present controversy.  According to said rule "as a general matter, a federal statute does apply to Puerto Rico under [48 U.S.C.] § 734."  United States v. Acosta-Martínez, 252 F.3d 13, 18 (1st Cir. 2001)(finding that the Federal death penalty applies to Federal crimes committed in Puerto Rico notwithstanding a provision in the Commonwealth's constitution that prohibits its imposition).

There is abundant jurisprudence in which statutes that fail to specifically include Puerto Rico within the definition of "State," have nevertheless been interpreted to include Puerto Rico within the coverage of the legislation in question.  See, e.g., Acosta-Martínez, 252 F.3d at 20 n.6 (citing Examining Bd. of Engineers, Architects & Surveyors v. Flores de Otero, 426 U.S. 572, 590 (1976); TAG/ICIB Servs., Inc. v. Pan Am. Grain Co., 215 F.3d

-21-

172, 178 (1st Cir. 2000)(Interstate Commerce Commission Termination Act applies to Puerto Rico); United States v. López Andino, 831 F.2d 1164, 1167 (1st Cir. 1987)(statutory prohibition on conspiracies to deprive citizens of civil rights applies to Puerto Rico); United States v. Tursi, 655 F.2d 26, 27 (1st Cir. 1981) (assuming that Youth Corrections Act applies to Puerto Rico); NLRB v. Sec. Nat'l Life Ins. Co., 494 F.2d 336, 337-38 (1st Cir. 1974) (National Labor Relations Act applies to Puerto Rico)). See also Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 672 (1974)("Puerto Rico has thus not become a State in the federal Union like the 48 States, but it would seem to have become a State within a common and accepted meaning of the word."); United States v. Laboy-Torres, 553 F.3d 715, 721-22 (3d Cir. 2009) (O'Connor, Associate Justice, Retired)(same).

In fact, "[t]his [C]ourt has consistently applied statutes advancing federal interests to Puerto Rico even when Congress has been silent on the matter." Acosta-Martínez, 252 F.3d at 20 n.6. When seen in the context of the First Amendment rights in question and the paramount federal interests embodied in the provisions of the NVRA and HAVA, the present case should not be an exception to the application of the default rule as nothing in their content makes the provision in question "locally inapplicable," except, perhaps, the existence of the contravening Puerto Rico legislation in question as was the case in Acosta-

-22-

Martínez.  Federal elections statutes in general, as seen in NVRA's reference to FECA and HAVA's reference to the NVRA, are interwoven, and the advancement of their interests (i.e. the advancement of First Amendment protections) constitute a paramount and superceding national interest under the Supremacy Clause of the Constitution, which calls for the application of the default rule in this case.

In Acosta-Martínez this Court confidently stated that, even if Congress' intent to apply the death penalty to Puerto Rico were not as clear as it found it to be, "the outcome would be the same, since the default rule presumes the applicability of federal laws to Puerto Rico.  There is little reason to think that the federal interests in defining the punishment for federal crimes would have been considered by Congress to be a matter for local veto power."  Acosta-Martínez, 252 F.3d at 20. I am disillusioned by an outcome by which this Court applies the default rule to allow the imposition of the death penalty to Federal crimes committed in Puerto Rico, but fails to apply the same standard to promoting democratic rights through the First Amendment.

Paraphrasing what was stated by this Court in Acosta-Martínez in finding that it was Congress' intent to apply the federal death penalty to crimes committed in Puerto Rico, "[i]ndeed, it would be anomalous for Congress to grant the people of Puerto Rico American citizenship and then not afford them the

protection of the federal [voting] laws." Acosta-Martínez, 252 F.3d at 20-21.

The majority has attempted to establish that there are "enough signals" in the NVRA's legislative history to demonstrate that Congress intended to make this statute inapplicable to Puerto Rico. They attempt to bolster the importance of these signals by relegating the most significant statutory provision for our purposes --the provision which expressly mentions the office of Resident Commissioner-- to a footnote. The majority then characterizes this provision as "one contrary signal in an otherwise consistent set of factors." Maj. Op. at 6 n.6. I find this assertion to be beyond the pale. Struthiously ignoring a specific provision of a Congressional statute, while relying on the self-serving ruminations of individual Congressmen on the floor is a specially egregious means of defeating the exercise of the right to vote.[11] In this respect, Justice Scalia's comments in Conroy v.

_____

[11] It is unfortunate that the majority cites to Representative Solomon and Senator Helms' respective expressions as if they were somehow valuable signals of Congressional intent not to apply the NVRA to Puerto Rico, when in fact they were not made in the context of a discussion regarding the territorial application of the statute. During the intervention cited to by the majority, Sen. Helms explained:

> Mr. President, this conference report will cost the States, all 50 of them, and their respective taxpayers, millions of dollars while making it even easier for illegal aliens to register to vote and obtain welfare benefits.

> This is an outrageous set of circumstances, and I am

-24-

<u>Aniskoff</u> regarding legislative history are particularly relevant: "the use of legislative history [is] the equivalent of entering a crowded cocktail party and looking over the heads of the guests for

---

especially disappointed that the conference committee stripped out the Simpson-Helms amendment that would have prevented illegal aliens and noncitizens from voting. This amendment, approved by the Senate, was simple and straightforward: it allowed States to require proof of citizenship of any individual desiring to register to vote. Why did the political types in this country decide this was too much to ask?

Mr. President, without this amendment, illegal aliens such as Zoe Baird's chauffeur could end up voting in our elections. This bill should be called the Illegal Aliens' Voter Registration Act .

139 Cong. Rec. S5739 (1993).

Representative Solomon's expressions, which the majority also cites to, were made in the context of denouncing that the representatives of the territories were allowed to vote when, in his view, the statute did not apply to them. He stated:

Mr. Speaker in a few minutes four Delegates are going to come over here when we resolve ourselves into the Committee of the Whole and they are going to cast votes for this piece of legislation which mandates a cost on all 50 states, but not on the territories they represent, because the territories are not included.

This is typical of what is going to happens [sic] time after time, after time. That is why it is a shame that my colleagues have let this kind of rule to take place, I say to my colleagues, come over here and defeat the previous questions, and I'll have an opportunity to offer an amendment which would include the territories along with us other 50 poor states.

How about that?

<u>Id.</u> at H504.

one's friends." 507 U.S. 511, 519 (1993)(paraphrasing Judge Harold Leventhal). Using scant and irrelevant legislative history to exclude the election for the office of Resident Commissioner under the NVRA is thus disingenuous.

The majority also points to an earlier version of the statute to support its position. However, just last year, the Supreme Court stated that, to explain the unexplained disappearance of language from a bill the Court will not rely on "mute intermediate legislative maneuvers." <u>Milner</u> v. <u>Dep't of the Navy</u>, 131 S. Ct. 1259, 1266 (2011)(citing <u>Mead Corp.</u> v. <u>Tilley</u>, 490 U.S. 714, 723 (1989)).

### (2) Irreparable harm

The right to vote is without question a fundamental constitutional right guaranteed by the First Amendment of the Constitution. Conversely, but equally important, the right to abstain from voting also constitutes political speech, and as such, is entitled to the highest of protections under the provisions of the First Amendment. Infringement of either of these two modalities of the exercise of First Amendment rights by a State constitutes irreparable harm per se. <u>Elrod</u> v. <u>Burns</u>, 427 U.S. 347, 373 (1976); <u>Romero Feliciano</u> v. <u>Torres Gaztambide</u>, 836 F.2d 1, 10 (1st Cir. 1987). In fact, this same panel has also recently stated that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."

-26-

<u>Sindicato Puertorriqueño de Trabajadores</u>, No. 12-2171, slip op. at 17 (quoting <u>Elrod</u>, 427 U.S. at 373).

### (3) and (4) Balance of the equities and harm to the public interest

Having the benefit of the findings of the district court, which are fully supported by the record of the proceedings before said forum, it must forcefully be concluded that this court is required to find that the balance of the equities that may result from the issuance of a preliminary injunction ordering that Plaintiff-Appellant, and other voters stricken from the voter registration lists by reason of their abstention from voting in the 2008 election, clearly favors their reinstatement as voters eligible to vote on November 6, 2012. Depriving a citizen of this most fundamental right cannot begin to be equated to the administrative inconveniences that are claimed by Defendants-Appellees.

Closely related to this issue is the alleged harm to the public interest, an issue which can be mitigated in large part by the remedy that should have been put in place had the findings of the district court not been cast aside without explanation by this court. It is beyond ken that the public is <u>benefitted, not harmed</u>, by having the largest number of its citizens express themselves democratically in a properly conducted election.

## Conclusion

I am sorry to say that once again this Court's reluctance to recognize gross violations of fundamental rights results in the enlargement of the democratic deficit that already assails the United States citizens of Puerto Rico. <u>Igartúa</u> v. <u>United States</u>, 626 F.3d 592, 638-39 (1st Cir. 2010)(Torruella, J., dissenting).

I respectfully dissent.