Dissent by Judge O’SCANNLAIN;
Dissent by Judge BYBEE;
Dissent by Judge N.R. SMITH
ORDER
THOMAS, Chief Judge:
We granted, in a prior order, rehearing en bane in this appeal. In a separate order, filed concurrently with this opinion, -we scheduled en banc oral argument for the week of January 17, 2017, in San Francisco, California. The question, then, is whether to grant plaintiffs’ motion for an injunction pending appeal. A motions panel denied the motion in the first instance, but we may reconsider that decision as an en banc court. For the reasons stated herein, we grant the motion.
The standard for evaluating an injunction pending appeal is similar to that employed by district courts in déciding whether to grant a preliminary injunction. Lopez v. Heckler, 713 F.2d 1432, 1435 (9th Cir. 1983); see also Southeast Alaska Conservation Council v. U.S. Army Corps of Eng’rs, 472 F.3d 1097, 1100 (9th Cir. 2006) (order) (discussing injunctions pending appeal). Therefore, we grant the motion for a preliminary injunction pending appeal essentially for the reasons provided in the dissent in Feldman v. Arizona Sec’y of State, 840 F.3d 1057, 1085-98 (9th Cir. 2016), a copy of which is attached (along with a copy of the majority opinion).
However, there are additional considerations when we consider granting an injunction pending appeal in an election case. When faced with an appeal in cases in which an election' is pending, federal courts are “required to weigh, in addition to the harms attendant upon issuance or
*368 nonissuance of an injunction, considerations specific to election cases.” Purcell v. Gonzalez, 549 U.S. 1, 4, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006) (per curiam). And we do not “lightly interfere with ... a state election.” Sw. Voter Registration Educ. Project v. Shelley, 344 F.3d 914, 918 (9th Cir. 2003) (en banc).
At the outset, it is important to remember that the Supreme Court in Purcell did not set forth a per se prohibition against enjoining voting laws on the eve of an election. 549 U.S. at 4, 127 S.Ct. 5; see also Veasey v. Perry, — U.S. -, 135 S.Ct. 9, 10, 190 L.Ed.2d 283 (2014) (Ginsburg, J„ dissenting) (“Purcell held only that courts must take careful account of considerations specific to election cases, not that election cases are exempt from traditional stay standards.”). Rather, courts must assess the particular circumstances of each case in light of the concerns expressed by the Purcell court to determine whether an injunction is'proper.
In this case, the factors that animated the Supreme Court’s concern in Purcell are not present. First, the injunction does hot affect the state’s election processes or machinery. The injunction pending appeal sought by plaintiffs would not change the electoral process, it simply would enjoin enforcement of a legislative act that would criminalize the collection, by persons other than 'the voter, of legitimately cast ballots.
H.B. 2023 amended Arizona’s election statutes to provide that “A person who knowingly collects voted or unvoted early ballots from another person is guilty of a class 6 felony.” Ariz. Rev. Stat. § 16-1005(H). Enjoining enforcement of H.B. 2023 will not have any effect on voters themselves, on the conduct of election officials at the polls, or on the counting of ballots. Under H.B. 2023, as the State agrees, legitimate ballots collected.by third parties are accepted and counted, and there are no criminal penalties to the voter. So, under H.B. 2023, if a ballot collector were to bring legitimate ballots to a voting center, the^ votes would be counted, but the collector would be charged with a felony. Thus, the only effect of H.B. 2023, although it is serious, is to make the collection of legitimate ballots by third parties a felony. So, unlike the circumstances involved in Purcell or Southwest Voter, the injunction at issue here does not involve any change at all to the actual election process. That process will continue unaltered, regardless of the outcome of this litigation. The only effect is on third party ballot collectors, whose efforts to collect legitimate ballots will not be criminalized, pending our review. No one else in the electoral process is affected. And no electoral process is affected.
In contrast, the voter-ID law at issue in Purcell changed who was eligible to vote and directly told election officials to turn people away if they lacked the proper proof of citizenship. That circumstance is far different from the case at bar where, as the district court pointed out, the law “does not eliminate or restrict any method of voting, it merely limits who may possess, and therefore return, a voter’s early ballot.” Feldman v. Arizona Sec’y of State, — F.Supp.3d -, -, 2016 WL 5341180, at *9 (D. Ariz. 2016). Thus, in our case, in contrast to Purcell, an injunction will not confuse election officials or deter people from going to the polls for fear that they lack the requisite documentation. The election process is unaffected.
Second, none of the cases that caution against federal court involvement in elections involved a statute that newly criminalizes activity associated with voting. This law is unique in that regard.
Third, the concern in Purcell and Southwest Voter was that a federal court injunction would disrupt long standing state pro *369 cedures. Here, the injunction preserves the status quo prior to the recent legislative action in H.B. 2023. Every other election cycle in Arizona has permitted the collection of legitimate ballots by third parties to election officials. So, the injunction in this case does not involve any disruption to Arizona’s long standing election procedures. To the contrary, it restores the status quo ante to the disruption created by the Arizona legislature that is affecting this election cycle for the first time.
Fourth, unlike the circumstances in Purcell and other cases, plaintiffs did not delay in bringing this action. This action was filed less than six weeks after the passage of the legislation, and plaintiffs have pursued expedited consideration of their claims at every stage of the litigation, both before the district court and ours. Indeed, it was the State that opposed an expedited hearing and briefing schedule at every turn, not the plaintiffs. ■ •
Fifth, Purcell was decided prior to the Supreme Court’s opinion in Shelby Cty. Ala. v. Holder, — U.S. -, 133 S.Ct. 2612, 186 L.Ed.2d 651 (2013), which declared unconstitutional the Voting Rights Act’s coverage formula, and effectively invalidated preclearance requirements under § 5 of the Act. In short, Purcell was decided when the preclearance regime under § 5 of the Voting Rights Act was still intact, and Arizona was a covered jurisdiction. The Court in Purcell emphasized that the challenged law had already passed the then-effective § 5 preclearance requirements of the United States Department of Justice. As a result, there was a prima facie reason to believe that the challenged statute was not discriminatory, alleviating the-concern that the law violated'voting rights. Purcell, 549 U.S. at 3, 127 S.Ct. 5. That same reassurance is absent here.
Indeed, this case presents precisely the opposite concern. In 2012, Arizona submitted a previous iteration of H.B. 2023 for preclearance.' The Department of Justice expressed concern and refused to preclear the bill, S.B. 1412, without more information about its impact on minority voters. Rather than address this concern, Arizona withdrew S.B. 1412 from preclearance and repealed it the following session. Now, unhindered by the obstacle of preclearance, Arizona has again- enacted this law — a mere seven months before the general election — -with nothing standing in its way except this court. Thus, not only are the preclearance protections considered important in Purcell absent in this case, but it is quite doubtful that the Justice Department would have granted preclearance. In the wake of Shelby County, the judiciary provides the only meaningful review of legislation that may violate the. Voting Rights Act.[1]
Sixth, unlike the situation in Purcell, we have, as a. court,, given careful and thorough consideration to these issues. Purcell involved a barebones order issued by a two judge motion panel, which did .not contain a reasoned decision. As the Court described in Purcell, “[t]here has been no *370 explanation given by the Court of Appeals showing the ruling and findings of the District Court to be incorrect.” 549 U.S. at 5, 127 S.Ct. 5. Here, a three judge merits panel has held oral argument and issued a detailed, reasoned decision and dissent. Our en banc court has also considered these issues and reached a decision essentially for the reasons set forth in the dissent. This is not a case in which our court has issued an injunction without a detailed consideration and resolution of the issues.
In- short, the injunction applies to the operation of a statute that would impose felony sanctions on third parties for previously legal action in connection with elections when, as everyone concedes, the statute has no impact on the election process itself. We are preserving the status quo for this election, and we will consider the challenge to the new legislation at our en banc hearing in the next few months.
IT IS SO ORDERED.
APPENDIX
FOR PUBLICATION
UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
Leslie Feldman; Luz Magallanes; Merce-dez Hymes; Julio Morera; Oleo Ovalle; Peterson Zah, Former Chairman and First President of the Navajo Nation; The Democratic National Committee; DSCC, AKA Democratic Senatorial Campaign Committee; The Arizona Democratic Party; Kirkpatrick for U.S. Senate; Hillary for America, Plaintiffs-Appellants,
Bernie 2016, Inc., Interoenor-Plaintiff-Appellant,
v.
Arizona Seoretary of State’s Office; Michele Reagan, in her official capacity as Secretary of State of Arizona; Maricopa County Board of Supervisors; Denny Barney; Steve Chucri; Andy Kunasek; Clint Hickman; Steve Gallardo, member of the Maricopa County Board of Supervisors, in them official capacities; Maricopa County Recorder and Elections Department; Helen Purcell, in her official capacity as Maricopa County Recorder; Karen Osborne, in hér official capacity as Maricopa County Elections Director; Mark Brno-vich, in his official capacity as Arizona Attorney General, Defendants-Appellees,
The Arizona Republican Party, Interve-nor-Defendantr-Appellee.
No. 16-16698
D.C. No. 2:16-cv-01065-DLR
OPINION
Appeal from the United States District Court for the District of Arizona, Douglas L. Rayes, District Judge, Presiding
Argued and Submitted October 19, 2016, San Francisco, California
Filed October 28, 2016
Before: SIDNEY R. THOMAS, Chief Judge, and CARLOS T. BEA and SANDRA S. IKUTA, Circuit Judges.
Opinion by Judge IKUTA; Dissent by Chief Judge THOMAS ■
COUNSEL
Bruce V. Spiva (argued), Amanda R. Cal-íais, Elisabeth C. Frost, and Marc E. Elias, Perkins Coie LLP, Washington, D.C.; Joshua L. Kaul, Perkins Coie LLP, Madison, Wisconsin; Sarah R. Gonski and Daniel C. Barr, Perkins Coie LLP, Phoenix, Arizona; for Plaintiffs-Appellants.
Malcolm Seymour, Garvey Schubert Baker, New York, New York; D. Andrew Gao-na, Andrew S. Gordon, and Roopali H. Desai, Coopersmith Brockelman- PLC, *371 Phoenix, Arizona, for Intervenor-Plaintiff-Appellant.
Karen J. Hartman-Tellez (argued) and Kara M. Karlson, Assistant Attorneys General; Mark Bmovich, Attorney General; Office of the Attorney General, Phoenix, Arizona; for Defendants-Appellees.
Sara J. Agne (argued), Colin P. Abler, and Brett W. Johnson, Snell & Wilmer LLP, Phoenix, Arizona, for Intervenor-Defen-dants-Appellees.
OPINION
IKUTA, Circuit Judge:
In April 2016, Leslie Feldman and other appellants[1] brought an action in district court challenging Arizona House Bill 2023 (H.B. 2023), which precludes individuals who do not fall into one of several exceptions (e.g., election officials, mail carriers, family members, household members, and specified caregivers) froth collecting early ballots from another person. See 2016 Ariz. Legis. Serv. Ch. 5, § 1 (H.B. 2023) (West) (codified at Ariz. Rev. Stat. § 16-1005(H)~ (I)). According to Feldman, this state statute violates § 2 of the Voting Rights Act of 1966, 52 U.S.C. § 10301, the Fourteenth Amendment, and the First Amendment[2] because, among other things, it disproportionately and adversely impacts minorities, unjustifiably burdens the right to vote, and interferes with the freedom of association. After the district court denied Feldman’s motion for a preliminary injunction, Feld-man filed this emergency interlocutory appeal. Because the district court did not abuse its discretion in denying the motion, we affirm.
I
The district court’s order denying the motion for a preliminary injunction sets forth the facts in detail, Feldman v. Ariz. Sec’y of State’s Office, — F.Supp.3d -, No. CV-16-01065-PHX-DLR, 2016 WL 5341180 (D. Ariz. Sept. 23, 2016), so we provide only a brief summary of the pertinent background facts and procedural history. The district court’s factual findings are discussed in . detail as they become relevant to our analysis.
A
Arizona law permits “[a]ny qualified elector” to “vote by early ballot.” Ariz. Rev. Stat. § 16-541(A).[3] Early voting can occur by mail or in person at an on-site early voting location in the 27 days before an election. See id. § 16-542, All Arizona counties operate at least one on-site early *372 voting location. Voters may also return their ballots in person at any polling place without waiting in line, and several counties additionally provide special drop boxes for early ballot submission. Moreover, voters can vote early by mail, either for an individual election or by having them names added to a permanent early voting list. An early ballot is mailed to every person on that list as a matter of course no later than the first day of the early voting period. Id. § 16-544(F). Voters may return their early ballot by mail at no cost, but it must be received by 7:00 p.m. on election day. Id. §§ 16-642(0; 16-548(A).
Since 1992, Arizona has prohibited any person other than the elector from having “possession of that elector’s unvoted absentee ballot.” See 1991 Ariz. Legis. Serv. Ch. 310, § 22 (S.B. 1390) (West). In 1997, the Arizona legislature expanded that prohibition to prevent any person other than the elector from having possession of any type of unvoted early ballot. See 1997 Ariz. Legis. Serv. Ch. 5, § 18 (S.B. 1003) (West) (codified at Ariz. Rev, Stat. § 16-542(D)). As the Supreme Court of Arizona explained, regulations on the distribution of absentee and early ballots advance Arizona’s constitutional interest in secret voting, see Ariz. Const. art. VII, § 1, “by setting forth procedural safeguards to prevent undue influence, fraud, ballot tampering, and voter intimidation.” Miller v. Picacho Elementary Sch. Dist. No. 33, 179 Ariz. 178, 180, 877 P.2d 277 (1994) (en tianc).
Arizona has long supplemented its protection of the early voting process through the use of penal provisions, as set forth in section 16-1005 of Arizona’s statutes. For example, since 1999, it has been a class 5 felony for a person knowingly to mark or to punch an early ballot with the intent to fix an election. See 1999 Ariz. Legis. Serv. Ch. 32, § 12 (S.B. 1227) (codified as amended at Ariz. Rev. Stat. § 16-1005(A)). And in 2011, Arizona enacted legislation that made offering to provide any consideration to acquire an early ballot a class 5 felony. See 2011 Ariz. Legis. Serv. Ch, 105, § 3 (S,B. 1412) (codified at Ariz. Rev. Stat. § 16-1005(B)). That same legislation regulated the process of delivering “more than ten early ballots to an election official.” See id. (formerly codified at Ariz. Rev. Stat. § 16-1005(D)).
In 2016, Arizona again revised section 16-1005 by enacting H.B. 2023 to regulate the collection of early ballots. This law added the following provisions to the existing statute imposing penalties for persons abusing the early voting process: ■
H. A person who knowingly collects voted or unvoted early ballots from another person is guilty of a class 6 felony¡ An election official, a United States postal service worker or any other person who is allowed by law to transmit United States mail is deemed not to have collected an early ballot if the. official, worker or other person is engaged in official duties.
I. Subsection H of this section does .not apply to: ■
1. An election held by a special taxing district formed pursuant to title 48 for the purpose of protecting or providing services to agricultural lands or crops and that is authorized to conduct elections pursuant to title 48.
2. A family member, household member or caregiver of the voter. For the purposes of this paragraph:
(a) “Caregiver” means a person who provides medical or health care assistance to the voter in a residence, nursing care institution, hospice facility, assisted living center, assisted living facility,- assisted living home, residential care institu *373 tion, adult day health care facility or adult foster care home.
(b) “Collects” means to gain possession or control of an early ballot.
(c) “Family member” means a person who is related to the voter by blood, marriage, adoption or legal guardianship.
(d) “Household member” means a person who resides at the same residence as the voter.
Ariz. Rev. Stat. § 16-1005(H)-(I). Thus, this amendment to section 16-1005 makes it a felony for third parties to collect early ballots from voters unless the collector falls into one of many exceptions. See id. The prohibition does not apply to election officials acting as such, mail carriers acting as such, any family members, any persons who reside at the same residence as the voter, or caregivers, defined as any person who provides medical or health care assistance to voters in a range of adult residences and facilities. Id. § 16-1005(I)(2). H.B. 2023 does not provide that ballots collected in violation of this statute are disqualified or disregarded in the final election tally.
Before H.B. 2023’s enactment, third-party early ballot collection was available to prospective voters as an additional and convenient means of submitting a ballot. It was also an important part of the Democratic get-out-the-vote strategy in Arizona. Since at least 2002, the Arizona Demoeratic Party has collected early ballots from its core constituencies, which it views to include Hispanic, Native American, and African American voters. According to Feld-man, H.B. 2023⅛ limitation on third-party ballot collection will require the Democratic Party to retool its get-out-the-vote efforts, for example by increasing voter transportation to polling locations and revising its training scripts to focus on early in-person voting. This, in turn, will require the party to divert resources from projects like candidate promotion to more direct voter outreach to ensure that voters are either casting early ballots in person or mailing their ballots on time.
B
Feldman sued Arizona[4] in April 2016 alleging: '(1)' a violation of § 2 of the Voting Rights Act on account of H.B. 2023⅛ disparate adverse impact on voting opportunities for Hispanics, African Americans, and Native Americans,- (2) a denial of equal protection through unjustifiable burdening of the right to vote, (3) a denial of equal protection through disparate treatment, (4) a violation of the First Amendment right to freedom of association, and (5) a violation of the First and Fourteenth Amendments through the “fencing out” of Democratic voters.
.In June, Feldman moved for a preliminary . injunction prohibiting the enforcement of. H.B. 2023. After full briefing, the district court denied the motion on September 23, 2016, on the ground that Feld- *374 naan was not likely to succeed on the merits of any of her claims and had therefore also not shown a likelihood of irreparable harm. As to the § 2 claim, the district court reviewed the totality of the eviden-tiary record and found no evidence of a cognizable disparity between minority and non-minority voters. The district court held that Feldman was unlikely to succeed on her Fourteenth Amendment claim because H.B. 2023⅛ burden on voting was minimal and justified by the State’s interests in preventing absentee voter fraud and the perception of fraud. As to Feld-man’s First Amendment claims, the district court held that collecting ballots is not an expressive activity and that even if it were, the State’s regulatory interests were sufficient to justify the slight burden that H.B. 2023 imposes. The district court likewise ruled that Feldman was unlikely to succeed on her partisan fencing claim.
Feldman filed a timely notice of interlocutory appeal on the same day that the district court entered its order, and a few days later she filed an emergency motion in the district court to stay its order and enjoin the enforcement of H.B. 2023 pending appeal. The district court noted that the standard for obtaining an injunction pending appeal was the same as the standard for obtaining a preliminary injunction and denied the motion because Feldman had not shown that she was likely to succeed on the merits, Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008), or that “there are serious questions going to the merits” and “the balance of hardships tips sharply in the plaintiffs favor.”' All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011).
Feldman filed an emergency motion with this court for an injunction pending appeal and for an expedited appeal. On October 14, a motions panel denied the former request, but granted the latter. The parties were directed to.file simultaneous, merits briefs by October 17, and the appeal was argued orally on October 19.[5]
II
We have jurisdiction over this interlocutory appeal pursuant to 28 U.S.C. § 1292(a)(1). On an appeal from the denial of a preliminary injunction, we do not review the underlying merits of the claims. Sw. Voter Registration Educ. Project v. Shelley, 344 F.3d 914, 918 (9th Cir. 2003) (en banc) (per curiam). Instead, “[o]ur review is limited and deferential,” id. and we must affirm the district court’s order unless the district court abused its discretion. Hendricks v. Bank of Am., N.A., 408 F.3d 1127, 1139 (9th Cir. 2005).
Our abuse-of-discretion analysis proceeds in two steps. See Gilman v. Schwarzenegger, 638 F.3d 1101, 1105-06 (9th Cir. 2011) (citing United States v. Hinkson, 585 F.3d 1247, 1261 (9th Cir. 2009) (en banc)). At step one, we ask whether the district court “based its ruling on an erroneous view of the law,” Bay Area Addiction Research & Treatment, Inc. v. City of Antioch, 179 F.3d 725, 730 (9th Cir. 1999), reviewing the district court’s interpretation of underlying legal principles de novo, Shelley, 344 F.3d at 918. We then ask whether the district court’s application of the legal standard was illogical, implausible, or otherwise without support in infer- *375 enees that may be drawn from the facts in the record. Hinkson, 585 F.3d at 1262. “We review findings of fact for clear error.” Shell Offshore, Inc. v. Greenpeace, Inc., 709 F.3d 1281, 1286 (9th Cir. 2013). “[A]s long as the district court got the law right, it will not be reversed simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case.” Id. (quoting Thalheimer v. City of San Diego, 645 F.3d 1109, 1115 (9th Cir. 2011)).[6]
A preliminary injunction is “an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.” Winter, 555 U.S. at 22, 129 S.Ct. 365. The standard to obtain such relief is accordingly stringent: “A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.” Id. at 20, 129 S.Ct. 365. A plaintiff must make a showing as to each of these elements, although in our circuit “if a plaintiff can only show that there are ‘serious questions going to the merits’ — a lesser showing than likelihood of success on the merits — then a preliminary injunction may still issue if the ‘balance of hardships tips sharply in the plaintiffs favor,’ and the other two Winter factors are satisfied.” Shell Offshore, 709 F.3d at 1291. “That is, ‘serious questions going to the merits’ and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest.” All for the Wild Rockies, 632 F.3d at 1135.
When faced with a request to interfere with a state’s election laws “just weeks before an election,” federal courts are “required to weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases.” Purcell v. Gonzalez, 549 U.S. 1, 4, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006) (per curiam). These considerations often counsel restraint. In the context of legislative redistricting, for example, the Supreme Court has long cautioned that “where an impending election is imminent and a State’s election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief .• even *376 though the existing apportionment scheme was found invalid.” Reynolds v. Sims, 377 U.S. 533, 585, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Similarly, the Supreme Court has declined to order the printing of new ballots at a “late date” even where the existing ballots were held-to have unconstitutionally excluded certain candidates. Williams v. Rhodes, 393 U.S. 23, 34, 89 S.Ct 5, 21 L.Ed.2d 24 (1968). We have also declined on equitable grounds to interfere with the mechanics of fast-approaching elections. See Lair v. Bullock, 697 F.3d 1200, 1214 (9th Cir. 2012) (staying a district court’s injunction “given the imminent nature of the election”); Shelley, 344 F.3d at 919 (declining to enjoin an imminent recall election). And we are not alone in doing so. See, e.g., Veasey v. Abbott, 830 F.3d 216, 243 (5th Cir. 2016) (en banc) (“[T]he district court should fashion an appropriate remedy in accord with i,ts findings; provided, however, that any remedy will not be made effective until after the November 2016 election.”); Veasey v. Perry, 769 F.3d 890, 895 (5th Cir. 2014) (staying an injunction “in light of the importance of maintaining the status quo on the eve of an election”); Colon-Marrero v. Conty-Perez, 703 F.3d 134, 139 n.9 (1st Cir. 2012) (noting that “even where plaintiff has demonstrated a likelihood of success, issuing an injunction on the eve of an election is an extraordinary remedy with risks of its own”); Serv. Emps. Int’l Union Local 1 v. Husted, 698 F.3d 341, 345 (6th Cir. 2012) (“As a general rule, last-minute injunctions changing election procedures are strongly disfavored.”); Ne. Ohio Coal. for the Homeless v. Blackwell, 467 F.3d 999, 1012 (6th Cir. 2006) (vacating in part a temporary restraining order that “needlessly creates disorder in electoral processes”).
HI
. With these principles in mind, we turn to our review of the district court’s order denying Feldman’s motion for a preliminary injunction against the enforcement of H.B. 2023. On. appeal, Feldman argues •that the district court erred in concluding that she was unlikely to succeed on her Voting Rights Act, Fourteenth Amendment, and First Amendment claims.[7] We consider each of these arguments in turn.
A
We first consider Feldman’s claim that H.B. 2023 violates § 2 of the Voting Rights Act.
1
“Inspired to action by the civil rights movement,” Congress enacted the Voting Rights Act of 19.65 to improve enforcement of the Fifteenth Amendment.[8] Shelby County v. Holder, — U.S. -, 133 S.Ct. 2612, 2619, 186 L.Ed.2d 651 (2013). Section 5 of the Act prevented states from making certain changes in voting procedures unless those changes obtained “preclearance,” meaning they were approved by either the Attorney General or a court of three judges. Id. at 2620. Section 2 of the Act forbade all states from enacting any *377 “standard, practice, or procedure ... imposed or applied ... to deny or abridge the right of any citizen of the United States to vote on account of race or color.” Id. at 2619 (quoting Voting Rights Act of 1965, § 2, 79 Stat. 437).
“At the time of the passage of the Voting Rights Act of 1965, § 2, unlike other provisions of the Act, did not provoke significant debate in Congress because it was viewed largely as a restatement of the Fifteenth Amendment.” Chisom v. Roemer, 501 U.S. 380, 392, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991). In 1980, a plurality of the Supreme Court held that the Fifteenth Amendment, and therefore the Voting Rights Act, were violated only if there was intentional discrimination on account of race. City of Mobile v. Bolden, 446 U.S. 55, 60-62, 100 S.Ct. 1519, 64 L.Ed.2d 47 (1980) (plurality opinion).
In response to Bolden, “Congress substantially revised § 2 to make clear that a violation could be proved by showing discriminatory effect alone and to establish as the relevant legal standard the ‘results test/” applied by the Supreme Court in White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), and by other federal courts before Bolden. Thornburg v. Gingles, 478 U.S. 30, 35, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). Opinions decided before Bolden had addressed “vote dilution” claims, that is, challenges to practices that diluted a minority group’s voting power. See Shaw v. Reno, 509 U.S. 630, 641, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). In amending § 2, Congress acted to “prohibit legislation that results in the dilution of a minority group’s voting strength, regardless of the legislature’s intent.” Id. (emphasis omitted); see also Gingles, 478 U.S. at 47-51, 106 S.Ct. 2752. Section 2 also applied to “vote denial” claims, meaning challenges. to practices that denied citizens the opportunity to vote, such as literacy tests.
As amended in the 1982 amendments, Section 2 of the Voting Rights Act provides:
§ 10301. Denial or abridgement of right to vote on account of race or color through voting qualifications or prerequisites; establishment of violation
(a) No voting qualification or prerequisite. to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in , a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).
(b) A. violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members .have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.
52 U.S.C. § 10301.
The Supreme Court interpreted this language in Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25. Gingles explained that to make out a § 2 violation, a plaintiff must show that “under the totality of the circumstances, a challenged election law or procedure had the effect of denying a protected minority an equal chance to participate in the electoral process.” Id. at 44 n.8, 106 S.Ct. 2752. The “totality of the circumstances” includes factors that the Senate derived from cases *378 decided before Bolden. See id.[9] As summarized by the Court,- “[t]he essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect them preferred representatives.” Id. at 47, 106 S.Ct. 2762.
Although many courts have analyzed vote dilution claims, “there is little authority on the proper test to determine whether the right to vote has been denied or abridged on account of race.” Veasey v. Abbott, 830 F.3d at 244 (emphasis omitted); see also Ohio Democratic Party v. Husted, 834 F.3d 620 (6th Cir.2016).[10] Recently, the Fourth, Fifth, and Sixth Circuits (and, in part, the Seventh Circuit) have adopted a two-part framework, based on the text of § 2 and the Supreme Court’s guidance in Gingles. The test is as follows:
[1] [T]he challenged standax-d, practice, or procedure must impose a discrimina *379 tory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their -choice, [and]
.[2] [T]hat burden must in part be caused by or linked to social and historical conditions that have or. currently produce discrimination against members of the protected class.
League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 240 (4th Cir. 2014); Veasey v. Abbott, 830 F.3d at 244; Ohio Democratic Party, 834 F.3d at 637-40; Frank v. Walker, 768 F.3d 744, 764-66 (7th Cir. 2014) (adopting the test “for the sake of argument”).
We agree with this two-part framework, which is consistent with Supreme Court precedent, our own precedent, and with the text of § 2. Under the first prong, a plaintiff must show that the challenged voting practice results in members of a protected minority group having less opportunity than other members of the electorate to participate in the political process. Gonzalez v. Arizona, 677 F.3d 383, 406 (9th Cir. 2012) (en banc) (citing Smith v. Salt River Project Agric. Improvement & Power Dist., 109, F.3d 586, 596 (9th Cir. 1997)). This language “encompasses Section 2’s definition of what kinds of burdens deny or abridge the right to vote.” Veasey v. Abbott, 830 F.3d at 244. Section 2(a) prohibits a state or political subdivision from imposing any “voting qualification or prerequisite to voting” or other “standard, practice, or procedure” in a way that “results in a denial or abridgement” of any U.S. citizen’s right to vote on account of race, color, or membership in “a language minority group,” 52 U.S.C. § 10303(f), “as provided in subsection (b).” Id. § 10301(a). Subsection (b), in turn, provides that a plaintiff can establish a violation of. § 2(a) if “based on the totality of circumstances,” the “political processes leading to nomination or election in the State or political subdivision are'not equally open to participation” by members of a protected class “in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.” Id. § 10301(b).
In interpreting this first prong, we have held that “a bare statistical showing of disproportionate impact on a racial minority does not satisfy the § 2 ‘results’ -inquiry.” Salt River, 109 F.3d at 595 (emphasis omitted). Rather, “Section 2 plaintiffs must show a causal connection between the challenged voting practice and [a] prohibited discriminatory result.” Id. As explained by the Sixth Circuit, a “challenged standard or practice causally contributes to the alleged discriminatory impact by affording protected group members less opportunity to participate in the political process.” Ohio Democratic Party, 834 F.3d at 637-38.
The second prong “draws on the Supreme Court’s guidance in Gingles,” Veasey v. Abbott, 830 F.3d at 245, which explains the language in § 2(b) requiring a plaintiff to show a violation of the Act “based on the totality of circumstances.” 52 U.S.C. § 10301(b). Under this second prong, the plaintiff must show that the challenged practice interacted with racial discrimination “to cause an inequality in the opportunities enjoyed by [minprity] and [non-minority] voters to elect them preferred representatives.” Gingles, 478 U.S. at 47, 106 S.Ct. 2752; see also Gonzalez, 677 F.3d at 405-06. In Gonzalez, we did not have occasion to reach this second step because the plaintiff had adduced no evidence of a causal connection between the challenged photo ID law and a dispro *380 portionate burden on minorities. 677 F.3d at 407. If a plaintiff adduces no evidence that the challenged practice places a burden on protected minorities that causes them to have “less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice,” 52 U.S.C. § 10301(b), there is no § 2 violation “whether or not” the challenged practice is “interacting with the history of discrimination” at the second prong of the test, Gonzalez, 677 F.3d at 407. However, we agree with our sister circuits that to show a § 2 violation, a plaintiff must establish that the challenged practice imposes a disproportionate burden on minorities compared to non-minorities, and that the challenged law interacts with social and historical conditions that have produced discrimination to cause minorities to have fewér opportunities to participate in the electoral process. See League of Women Voters of N.C,, 769 F.3d at 240; Veasey v. Abbott, 830 F.3d at 244; Ohio Democratic Party, 834 F.3d at 637-40.
The district court’s legal determinations are reviewed de novo, Gonzalez, 677 F.3d at 406, but we defer to “the district court’s superior fact-finding capabilities,” and review its factual findings for clear error, Salt River, 109 F.3d at 591. In analyzing the first prong of a § 2 claim, the district court has the primary responsibility for determining “based ‘upon a searching practical evaluation of the past and present reality,’-.;. whether the political process is equally open to minority voters.” Id. (quoting Gingles, 478 U.S. at 79, 106 S.Ct. 2752). At the second prong of a § 2 claim, the district court must make the “ultimate finding whether, under the totality of the circumstances, the challenged practice violates § 2.” Gonzalez, GJI F.3d at 406. This “ultimate finding” is a question of fact that we review for clear error.[11] Id.
2
This case raises a vote denial claim, in that Feldman claims that H.B. 2023’s restriction on the use of certain third-party ballot collectors denies or abridges minorities’ opportunity to vote. As to the first prong of a § 2 claim, Feldman argues that H.B. 2023 caused minority group members to have less opportunity to participate in the political process than non-minorities. Feldman bases this claim on a multi-step argument. First, Feldman points to evidence in the record that Aiinorities are statistically less likely than non-minorities to have access to a vehicle, are more likely to have lower levels of education and English proficiency than non-minorities, are more likely to suffer from health problems than non-minorities, are more likely to have difficult financial situations than non-minorities, and are more likely than non-minorities to rent 'houses rather than own them, which in turn makes them more *381 likely to move than homeowners. Second, she argues that each of these differences between minorities and non-minorities shows-that minorities must rely on ballot collection by third parties-more than non-minorities because , minorities have less ability to make use of other alternative means of voting (such as voting by mail or in person). According to Feldman, this evidence shows that the burdens of H.B. 2023 fall more heavily on minorities than non-minorities. Feldman further contends that she satisfied the second prong of the § 2 test by introducing substantial evidence supporting eight of the nine Senate Factors.
The district court rejected this argument at the first prong of the § 2 test based on its determination that Feldman failed to show that H.B. 2023 will cause protected minorities to have less electoral opportunities than non-minorities. The district court based its conclusion on both a per se legal rule and on its review of the evidence. First, the district court held that Feldman failed to provide any quantitative or statistical data showing that H.B. 2023’s rule precluding the use of certain third-party ballot collectors had a disparate impact on minorities compared to the impact on non-minorities. The district court determined that- as a matter of law, such data was necessary in order to establish a § 2 violation. Feldman does not dispute that she did not provide any direct data on the use of third-party ballot collectors,[12] but argues such data is not necessary to show a disproportionate burden on minorities, and so the district court’s ruling to the contrary was legal error.
While § 2 itself does not require quantitative evidence, past cases suggest that such evidence is typically necessary to establish a disproportionate burden on minorities’ opportunity to participate in the political process.[13] See, e.g., Veasey v. Abbott, 830 F.3d at 244 (noting that “courts regularly utilize statistical analyses to discern whether a law has a discriminatory impact”); Frank, 768 F.3d at 752; Gonzalez, 677 F.3d at 405-07. Indeed, .we are unaware of a vote denial case holding that *382 a challenged practice placed a disproportionate burden on a protected minority-leading to “less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice” under § 2 without such quantitative or statistical data. 52 U.S.C. § 10301(b).[14] Notably, Feldman did present statistical evidence in our companion case, discussed supra n.5.
We need not resolve this legal issue, however, because despite its ruling regarding the lack of statistical or quantitative evidence, the district court proceeded to review all the evidence in the record and rested its conclusion that Feldman had failed to satisfy the first prong of § 2 on the alternate ground that Feldman did not show that the burden of H.B. 2023 impacted minorities more than non-minorities. Deferring to “the district court’s superior fact-finding capabilities,” Salt River, 109 F.3d at 591, we conclude that this holding is not clearly erroneous.
To satisfy the first prong, Feldman adduced several different categories of evidence, including individual declarations, legislative history, and files from the Department of Justice.
First, the record includes the declarations of Arizona Democratic lawmakers and representatives of organizations that have collected and returned ballots in pri- or elections. These declarations generally state that members of the communities they have assisted rely on ballot collection services by third parties. The district court discounted this testimony because the declarants did not provide any comparison between the minority communities and non-minority communities. The record supports this finding. The majority of the declarants focused their efforts and obtained their experiences in minority communities.[15] None of these declarants compared the impact of H.B. 2023 on minorities as compared to non-minorities. While two of the declarations made con- *383 elusory- statements that H.B. 2023 “disproportionately impacts” protected minorities, it is not clear error for the district court to discount such statements, where the declarant did not provide the basis for the conclusion. Cf. Herb Reed Enters., LLC v. Fla. Entm’t Mgmt., Inc., 736 F.3d 1239, 1250 (9th Cir. 2013) (indicating that a district court should not rely on “unsupported and conclusory statements” when finding facts as part of a preliminary injunction- analysis).
Other declarations submitted to the district court stated generally that ballot collection by third parties benefits elderly voters, homebound voters, forgetful voters, undecided voters, and voters from rural areas, but the court found no evidence that these categories of voters were more likely to be minorities than non-minorities. Again, this finding is not clearly erroneous. For instance, the district court stated that while Feldman had provided evidence that the rural communities ‘ of Somerton' and San Luis were 95.9% and 98.7% Hispanic or Latino and lacked home mail delivery, she did not provide evidence about home mail delivery to non-minorities who reside in the rural communities of Colorado City, Fredonia, Quartzite, St. David, Star Valley, and Wickenburg that are 99.5%, 89.1%, 92.5%, 92.1%, 91.4%, and 90.5% white, respectively. Similarly, while the record shows that the Tohono O’odham Nation lacks home mail delivery service, Feldman does not point to evidence showing that H.B. 2023 has a disproportionate impact on members of the Tohono O’od-ham Nation compared to non-minorities who also live in rural communities.[16] The district ■ court also rejected Feldman’s argument that declarations provided by Sergio Arellano, President of the Tucson Chapter of the Arizona Latino Republican Association, and Kevin Dang, President of the Vietnamese Community of Arizona, admitted that “minority voters disproportionately rely on ballot collection.” The district court concluded that these declarations indicated only that minorities are disproportionately vulnerable to being taken advantage of by ballot collectors because they often do not understand English. This conclusion was not clear error.
In addition, to the multiple declarations described above, Feldman submitted legislative testimony from the debates on H.B. 2023, showing that a number of lawmakers expressed concerns that H.B. 2023 would impact minority communities, rural communities, working families, and the elderly. This evidence likewise failed to compare minority communities to non-minority communities.
Finally,' the district court considered the Department of Justice’s files regarding its evaluation of S.B. 1412 (a prior Arizona bill proposing ballot collection restrictions) for purposes of determining whether the bill was entitled to preclearance under. § 5 of the Voting Rights Act.[17] The file contained summaries of telephone conversations be *384 tween a Department of Justice attorney and various individuals about ballot collection practices in Arizona. None of these summaries provide a comparison of the effect of S.B, 1412 on minorities and non-minorities. Feldman claims that a summary of a phone call with then-Arizona Elections Director Amy Bjelland shows that Arizona legislators targeted S.B. 1412 at Hispanic communities. The district court, however, reasonably interpreted this phone summary as stating that the impetus for S.B. 1412 was an accusation of voter fraud in San Luis, a predominately Hispanic area in the southern portion of Arizona, that S.B. 1412 was aimed at this sort of fraud, and that in Bjelland’s view, voter fraud was more prevalent at the border because individuals living closer to the border are more impacted by corruption and voting fraud claimed to exist in Mexico.
On appeal, Feldman argues that the district court erred because it did not accept her multi-step argument that she met the first prong of § 2 based on evidence that certain socioeconomic circumstances disparately impact minorities, and this disparate impact would combine with a lack of certain third-party ballot collectors to lessen minorities’ opportunities in the political process. We reject this argument. Feld-man’s evidence of differences in the socioeconomic situation of minorities and non-minorities does not satisfy the first prong of the § 2 test because it does not show that H.B. 2023 causes a protected minority group to have less opportunity than other members of the electorate to participate in the political process. See Gingles, 478 U.S. at 44 n.8, 106 S.Ct. 2752. Proof of a causal connection between the challenged voting practice and a prohibited result is “crucial,” Gonzalez, 677 F.3d at 405 (citing Salt River, 109 F.3d at 595), and Feldman points to no evidence that the restriction on third-party ballot collection causes minorities to have less opportunity to vote than non-minorities. Indeed, although H.B. 2023 was in effect for all but the first three days of early voting for the Primary Election, the record does not include any testimony by minority voters that their ability to participate in the political process was affected by the inability to use a third-party ballot collector. The district court did not clearly err in declining to make the inference urged by Feldman (i.e., that due to minorities’ socioeconomic status, they were likely to have fewer opportunities than non-minorities to participate in the political process if they could not use certain third-party ballot collectors) in the absence of evidence supporting that inference.
We rejected a similar argument in Gonzalez. As in this case, the plaintiff in Gonzalez argued that a law requiring prospective voters- to obtain a photo identification before they cast ballots at the polls violated § 2 because it had a statistically significant disparate impact on Latino voters. 677 F.3d at 406. To support this argument, the plaintiff presented evidence “of- Arizona’s general history of discrimination against Latinos and the existence of racially polarized voting.” Id. at 407. Despite this general history of discrimination, we affirmed the district court’s rejection of this claim, because the plaintiff was unable *385 to produce evidence-that the photo identification law caused minorities to have less opportunity to participate in the political process. Id,.; see also Frank, 768 F.3d at 752-55 (holding that a photo identification law which had a disparate impact on minorities did not violate § 2 because plaintiffs failed to show that the law had caused a discriminatory result).'For the same reason, Feldman’s evidence regarding the socioeconomic situation of minorities is insufficient in the absence of evidence that H.B. 2023 caused minorities to have less opportunity to participate in the political process.
In short, the district court did not clearly err in concluding that Feldman adduced no evidence showing that H.B. 2023 would have an impact on minorities different than the impact on non-minorities, let alone that the impact would result in -less opportunity for minorities to participate in the political process as compared to non-minorities.[18] Because the court found that Feldman’s § 2 claim failed at the first prong, as in Gonzalez, the district court had no obligation to reach the second prong, and therefore did not err in dedin-ing to consider whether H.B. 2023 interacted with racial discrimination to cause a discriminatory result. See 677 F.3d at 407.[19] The district court’s conclusion that H.B. 2023 did not violate § 2 was not “(1) illogical, (2)'implausible, or (3) without support in inferences that may be drawn from the facts in the record,” Hinkson, 585 F.3d at 1262 (internal quotation marks omitted). Therefore, we hold that the district court did not abuse its discretion in finding Feld-man was unlikely to succeed on her Voting Rights Act claim.
B
Feldman also contends that the district court erred in concluding that her facial challenge to H.B, 2023 on constitutional grounds was unlikely to succeed on the merits. We' first lay - out the analytical framework for facial challenges to voting laws under the Fourteenth and First Amendments, and then consider Feldman’s challenges.[20]
1
The Constitution grants the States a “broad power, to prescribe the ‘Times, *386 Places and Manner of holding Elections for Senators and Representatives.’ ” Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 451, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) (quoting U.S. Const., art. 1, § 4, cl. 1). This power under the Elections Clause to regulate elections for federal offices “is matched by state control over the election process for state offices.” Id. (quoting Clingman v. Beaver, 544 U.S. 581, 586, 125 S.Ct. 2029, 161 L.Ed.2d 920 (2005)). “Governments necessarily ‘must play an active role in structuring elections,’ ” Pub. Integrity All., Inc. v. City of Tucson, 836 F.3d 1019, 1024 (9th Cir. 2016) (en banc) (quoting Burdick v. Takushi, 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992)), and “as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to- accompany the democratic processes,” Storer v. Brown, 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974).
However, when a state exercises its power and discharges its obligation “[t]o achieve ‘these necessary objectives,” the resulting laws “inevitably affect[ ] — at least to some degree — the individual’s right to vote and his right to associate with others for political ends.” Anderson v. Celebrezze, 460 U.S. 780, 788, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). Therefore, the state’s “power is not absolute, but is ‘subject to the limitation that [it] may not be exercised in a way that violates ... specific provisions of the Constitution.’” Wash. State Grange, 552 U.S. at 451, 128 S.Ct. 1184 (alterations in .original) (quoting Williams, 393 U.S. at 29, 89 S.Ct. 5). While the Constitution does not expressly guarantee the right to vote in state and federal elections, the Fourteenth Amendment protects a citizen’s right “to participate in elections on an equal basis with other citizens in the jurisdiction.” Dunn v. Blumstein, 405 U.S. 330, 336, 92 S.Ct. 995, 31 L.Ed.2d 274, (1972). That is, “once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.” Harper v. Va. State Bd. of Elections, 383 U.S. 663, 665, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966). Similarly, “[w]hile the freedom of association is not explicitly set out in the [First] Amendment,” Healy v. James, 408 U.S. 169, 181, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972), “the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment ... as an indispensable means of preserving other individual liberties,” Roberts v. U.S. Jaycees, 468 U.S. 609, 618, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). This right includes the ability “to associate ... for the advancement of common political goals and ideas,” Timmons v. Twin Cities Area New Party, 520 U.S. 351, 357, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997), and “the ability of citizens to band together in promoting among the electorate candidates who espouse their political views,” Cal. Democratic Party v. Jones, 530 U.S. 567, 574, 120 S.Ct. 2402, 147 L.Ed.2d 502 (2000). The Supreme Court has long recognized that “some forms of ‘symbolic speech’ [are] deserving of First Amendment protection.” Rumsfeld v. Forum for Acad. & Institutional Rights, Inc., 547 U.S. 47, 65, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006). However, First Amendment protection extends “only to conduct that is inherently expressive.” Id. at 66, 126 S.Ct. 1297. Conduct is inherently expressive if it “is intended to be communicative and ... in context, would reasonably be understood by the viewer to be communicative.” Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 294, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). For instance, burning *387 the American flag, Texas v. Johnson, 491 U.S. 397, 406, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989), and wearing an unauthorized military medal, United States v. Swisher, 811 F.3d 299, 314 (9th Cir. 2016) (en banc), are expressive conduct within the scope of the First Amendment.
The Supreme Court has explained that constitutional challenges to election laws “cannot be resolved by any ‘litmus-paper test’ that will separate valid from invalid restrictions.” Anderson, 460 U.S. at 789, 103 S.Ct. 1564. Rather, “a more flexible standard applies.” Burdick, 504 U.S. at 434, 112 S.Ct. 2059. “A court considering a challenge to a staté election law must weigh [1] ‘the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate’ against [2] ‘the precise interests put forward by the State as justifications for the burden imposed by its rule,’ taking into consideration [3] ‘the extent to which those interests make it necessary to burden the plaintiffs rights.’ ” Id. (quoting Anderson, 460 U.S. at 789, 103 S.Ct. 1564). This framework is generally referred to as the Anderson/Burdick balancing test. In applying this test, we: (1) identify and determine the magnitude of the burden imposed on voters by the election law; (2) identify the State’s justifications for the law; and (3) weigh the burden against the State’s justifications. The severity of the burden that an election law imposes “is a factual question on which the plaintiff bears the burden of proof.” Democratic Party of Haw. v. Nago, 833 F.3d 1119, 1122-24 (9th Cir. 2016) (citing Cal. Democratic Party, 530 U.S. 567, 120 S.Ct. 2402); Gonzalez v. Arizona, 485 F.3d 1041, 1050 (9th Cir. 2007) (noting that whether an election law imposes a severe burden is - an “intensely factual inquiry”).
“[T]he severity of the burden the election law imposes on the plaintiffs rights dictates the level of scrutiny applied by the court.” Ariz. Libertarian Party v. Reagan, 798 F.3d 723, 729 (9th Cir. 2015) (quoting Nader v. Cronin, 620 F.3d 1214, 1217 (9th Cir. 2010) (per curiam)). “This is a sliding scale test”: when the burden imposed is severe, not only the “more compelling the state’s interest must be,” Ariz. Green Party v. Reagan, 838 F.3d 983, 988 (9th Cir. 2016), but the regulation also “must be ‘narrowly drawn to advance a state interest of compelling importance,’” Burdick, 504 U.S. at 434, 112 S.Ct. 2059 (quoting Norman v. Reed, 502 U.S. 279, 289, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992)).
By contrast, “when a state election law provision imposes only ‘reasonable, nondiscriminatory restrictions’ upon the First and Fourteenth Amendment rights of voters, ‘the State’s important regulatory interests are generally sufficient to justify the restrictions.” Id. (quoting Anderson, 460 U.S. at 788, 103 S.Ct. 1564) ; see also Ariz. Green Party, 838 F.3d at 988 (“[A] state may justify election regulations imposing a lesser burden by demonstrating the state has important regulatory interests.” (quoting Ariz. Libertarian Party, 798 F.3d at 729-30)). While Burdick does not call for rational basis review, Pub. Integrity All., 836 F.3d at 1025, it likewise specifically declined to require that all voting regulations be narrowly tailored and subjected to strict scrutiny, see Burdick, 504 U.S. at 433, 112 S.Ct. 2059. Rather, Burdick held that when a statute imposes only a limited burden, the “ ‘precise interests’ advanced by the State” alone may be “sufficient to defeat [a plaintiffs] facial challenge,” Crawford v. Marion Cty. Election Bd., 553 U.S. 181, 203, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008) (controlling opinion of Stevens, J.) (quoting Burdick, 504 U.S. at 434, 112 S.Ct. 2059). See also Pub. In *388 tegrity All., 836 F.3d at 1027 (upholding a municipal election law, even though it was aimed at furthering the same interests as other municipal ordinances, because it might have marginal impact beyond that provided by other laws).
Finally, the Supreme Court has warned that facial challenges “are best when infrequent,” Sabri v. United States, 541 U.S. 600, 608, 124 S.Ct. 1941, 158 L.Ed.2d 891 (2004), and “are disfavored for several reasons” in the election, law context in particular, Wash. State Grange, 552 U.S. at 450, 128 S.Ct. 1184. For instance, Arizona “has had no opportunity to implement [H.B. 2023], and its courts have had no occasion to construe the law in the context of actual disputes arising from the electoral context, or to accord the law a limiting construction to avoid constitutional questions.” Id. “Claims of facial invalidity often rest on speculation,” and “raise the risk of ‘premature interpretation of statutes on the basis of factually barebones records.’ ” Id. (quoting Sabri, 541 U.S. at 609, 124 S.Ct. 1941). When faced with underdeveloped “evidence regarding the practical consequences of [H.B. 2023], we find ourselves in the position of Lady Justice: blindfolded and stuck holding empty scales.” Ariz. Green Party, 838 F.3d at 990 (quoting Ariz. Libertarian Party, 798 F.3d at 736 (McKeown,, J,, concurring)). Accordingly, plaintiffs, asserting a facial challenge “bear a heavy burden of persuasion,” the magnitude of which the Supreme Court has reminded us “to give. appropriate weight.” Crawford, 553 U.S. at 200, 128 S.Ct. 1610.
2
We now turn to Feldman’s Fourteenth Amendment claim. Feldman claims that the district court made a number of errors in determining that she was unlikely to prevail on the merits of her claim that H.B, 2023 imposes an undue burden on Arizona voters that is not outweighed by the State’s asserted interests. ■
Feldman fust argues that the district court erred in its application of the Anderson/Burdick framework. Under this framework, a district court must first consider the burden posed by H.B. 2023. Burdick, 504 U.S. at 434, 112 S.Ct. 2059. In considering this burden, we must take care to avoid the “sheer, speculation” that often accompanies the assessment of burdens when considering facial challenges. Wash. State Grange, 552 U.S. at 454, 128 S.Ct. 1184; see also Chicanos Por La Causa, Inc. v. Napolitano, 558 F.3d 856, 866 (9th Cir, 2008) (“In any event, a speculative, hypothetical possibility does not provide an adequate basis to sustain a facial challenge.”).
Here, the district court did not clearly err in finding that H.B. 2023 did not “significantly increase the usual burdens of voting.” As an initial matter, H.B. 2023 on its face imposes less of a burden than the challenged law did in Crawford. Crawford considered the impact of Indiana’s voter-ID law, which required voters who lacked photo ID to sustain “the inconvenience of making a trip to the [state Bureau of Motor Vehicles], gathering the required documents, and posing for a photograph” to obtain the requisite identification. 553 U.S. at 198, 128 S.Ct. 1610. In the alternative, a voter who could not or did not want to obtain a photo ID could submit a provisional ballot and “travel to the circuit court clerk’s offícé within 10 days to execute the required affidavit” accompanying the provisional ballot. Id. at 199, 128 S.Ct. 1610. The Court found that the law imposed “only a limited burden on voters’ rights.” Id. at 203, 128 S.Ct. 1610 (quoting Burdick, 504 U.S. at 439, 112 S.Ct. 2059); see id. at 209, 128 S.Ct. 1610 (Scalia, J., concurring in the judgment).
*389 Crawford’s finding of a limited burden compels a similar conclusion here. While the Indiana photo ID law imposed an affirmative requirement that voters. possess photo ID in order to vote, H.B. 2023 limited only one of several methods of voting that Arizona law otherwise makes available: only third-party ballot collectors who do not qualify under the statute are precluded from delivering ballots. The district court’s conclusion that the limitation of one alternative for ballot collection does not “represent a significant increase over the usual burdens of voting” is not clearly erroneous. Crawford, 553 U.S. at 198, 128 S.Ct. 1610; see Ohio Democratic Party, 834 F.3d at 628 (rejecting a challenge to Ohio’s “withdrawal of the convenience of same-day registration” and holding that the Constitution does not “require all states to maximize voting convenience”).[21]
Further, any burden imposed by H.B. 2023 is mitigated by the availability of alternative means of voting. The lead opinion in Crawford held that the burden imposed by Indiana’s voter-ID law was “mitigated by the fact that,-if eligible, voters without photo identification may cast provisional ballots,” even though doing so required a voter to make two trips: the first to vote and the second to execute the required affidavit. 553 U.S. at 199, 128 S.Ct. 1610. Here, H.B. 2023 could at most require that a voter make that first trip— to vote in the first instance. Because making two trips does not represent a burden “over the usual burdens of voting” in Crawford, id. at 198, 128 S.Ct. 1610, the district court -could reasonably determine that the single trip required here does not represent such a burden, either. Although Feldman contends that “thousands” of Arizona voters rely on third-party ballot collection in order to cast their early ballots,” the record does not support her additional claim that without ballot collection by third parties disqualified by H.B. 2023, many Arizona voters “would not have been able to vote in prior elections.”
Feldman also argues that the district court erred in failing to consider the burdens imposed on specific groups of voters for whom H.B. 2023 poses a more serious challenge. We disagree, because the evidence in the record was insufficient for such an analysis. While a court may consider a.law’s impact on subgroups, there must be sufficient evidence to enable a court “to quantify the burden imposed on the subgroup.” Pub. Integrity All., 836 F.3d at 1024 n.2 (citing Crawford, 553 U.S. at 199-203, 128 S.Ct. 1610; id. at 212-17, 128 S.Ct. 1610 (Souter, J., dissenting)); see also Ne. Ohio Coal. for the Homeless v. Husted, 837 F.3d 612, 631 (6th Cir.2016) (holding that Crawford may permit “weighing the ‘special burden’ faced by ‘a small number of voters’” when there is “quantifiable evidence from which an arbiter could' gauge the frequency with which this narrow class of voters has been or will become disenfranchised,” but that in the absence of such evidence, a court should “consider the burden that the- provisions place on all ... voters.”' (quoting Crawford, 553 U.S. at 200, 128 S.Ct. 1610)), reh’g en banc denied, (6th Cir. Oct. 6, 2016). In Crawford, the Court acknowledged that the photo ID requirement placed “a somewhat heavier burden ... on *390 a limited number of persons,” but did not consider this burden because it was “not possible to quantify either the magnitude of the burden on this narrow class of voters or the portion of the burden imposed on them that is fully justified.” 553 U.S. at 199-200, 128 S.Ct. 1610. Accordingly, the Court instead considered “the statute’s broad application to all ... voters.” Id. at 202-03, 128 S.Ct. 1610 (quoting Burdick, 504 U.S. at 439, 112 S.Ct. 2059). Here, the record includes broad assertions regarding the number of ballots previously collected, but does not include sufficient “concrete evidence” of “the number of registered voters” within specific groups or evidence that permits weighing of the burden on these voters, such as whether H.B. 2023 would merely inconvenience these voters or preclude them from voting. Id. at 200-01, 128 S.Ct. 1610. Given the paucity of evidence regarding these key issues, the district court did not err in declining to focus on the burden on specific groups. See id. at 201-02, 128 S.Ct. 1610. We conclude that the district court did not clearly err in identifying and assessing the burden imposed by H.B. 2023.
Because the district court did not clearly err in its determination of the burden imposed by H.B. 2023 on the right to vote, we proceed to the second step of the Anderson/Burdick framework and consider Arizona’s interests. Feldman does not dispute that Arizona’s interest in preventing absentee-voting fraud and maintaining public confidence in elections are “relevant and legitimate state interests,” Crawford, 553 U.S. at 191, 128 S.Ct. 1610, nor could she. “A State indisputably has a compelling interest in preserving the integrity of its election process.” Purcell, 549 U.S. at 4, 127 S.Ct. 5 (quoting Eu v. S.F. Cty. Democratic Cent. Comm., 489 U.S. 214, 231, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989)). “While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear.” Crawford, 553 U.S. at 196, 128 S.Ct. 1610. Similarly, “public confidence in the integrity of the electoral process has independent significance, ‘ because it encourages citizen participation in the democratic process.” Id. at 197, 128 S.Ct. 1610. And as the district court correctly recognized, absentee voting may be particularly susceptible to fraud, or at least perceptions of it. See Crawford, 553 U.S. at 225, 128 S.Ct. 1610 (Souter, J., dissenting); Griffin v. Roupas, 385 F.3d 1128, 1131 (7th Cir. 2004); see also United States v. Townsley, 843 F.2d 1070 (8th Cir. 1988). The district court did not err in crediting Arizona’s important interest in preventing fraud even in the absence of evidence that voter fraud had been a significant problem in the past. In Crawford, the Court noted that “[t]he record contains no evidence of any such fraud actually occurring,” but nonetheless concluded that “not only is the risk of voter fraud real but ... it could affect the outcome of a close election.” 553 U.S. at 194-96, 128 S.Ct. 1610; see also Ohio Democratic Party, 834 F.3d at 632-33; Frank, 768 F.3d at 749-50. Courts recognize that legislatures need not restrict themselves to a reactive role: legislatures are “permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively.” Munro v. Socialist Workers Party, 479 U.S. 189, 195-96, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986).
Feldman also contends that the district court made several legal errors in assessing Arizona’s interests and in weighing them against the burden on voters. First, Feldman argues that the district court erred in holding that “laws that do not significantly increase the usual burdens of voting do not raise substantial constitutional concerns.” We disagree. It is axio *391 matic that under a balancing test such as Anderson/Burdick’s, less weight on one side of the scale allows that scale to be more easily tipped in the other direction. “[W]hen a state election law provision imposes only ‘reasonable, nondiscriminatory restrictions’ upon the First and Fourteenth Amendment rights of voters, ‘the State’s important regulatory interests are generally sufficient to justify’ the restrictions.” Burdick, 504 U.S. at 434, 112 S.Ct. 2059 (quoting Anderson, 460 U.S. at 788, 103 S.Ct. 1564).
Second, Feldman argues that the district court failed to consider the means-end fit between Arizona’s interests in preventing absentee-voting fraud and eliminating the perception of fraud on the one hand and the burdens imposed on voters on the other hand. Relying on a vacated Sixth Circuit opinion, see Ohio State Conference of the NAACP v. Rusted, 768 F.3d 524 (6th Cir. 2014), vacated, No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014), Feld-man argues that Arizona was required to “explain why the particular restriction imposed is actually necessary,” id. at 545. Again, we disagree. The lead opinion in Crawford held that a limited burden on voters’ rights imposed by the challenged law was outweighed by two “unquestionably relevant” interests offered by the state, without considering the fit between those interests and the voter-ID law. See 553 U.S. at 203, 128 S.Ct. 1610. And as several of our sister circuits have recognized, it is “practically self-evidently true” that implementing a measure designed to prevent voter fraud would instill public confidence. Ohio Democratic Party, 834 F.3d at 633 (citing Crawford, 553 U.S. at 197, 128 S.Ct. 1610); see Frank, 768 F.3d at 750 (noting that Crawford took “as almost self-evidently true” the relationship between a measure taken to prevent voter fraud and promoting voter confidence). By asserting its interest in preventing election fraud and promoting public confidence in elections, essentially the same interests as in Crawford, Arizona bore its burden of establishing “important regulatory interests” sufficient to justify the minimal burden imposed by H.B. 2023. Accordingly, the district court could reasonably conclude that Arizona’s means — restricting third-party ballot collection — matched the desired ends of preventing voter fraud and promoting voter confidence in the electoral system.[22]
For similar reasons, we reject Feld-man’s argument that the district court erred in not considering whether Arizona’s “goals could have been achieved through less burdensome means.” Neither the Supreme Court nor we have required a state to prove there is no less restrictive alternative when the burden imposed is minimal. Burdick expressly declined to require that restrictions imposing minimal burdens on voters’ rights be narrowly tailored. See *392 504 U.S. at 433, 112 S.Ct. 2059. Consistent with Burdick, we upheld in Public Integrity Alliance an election restriction (ward-based primary elections) that furthered the interest of “ensuring local representar tion by and geographic. diversity among elected officials” by ensuring that “the candidates nominated in a given ward actually have the support of a majority of their party’s voters in that ward,” even though other less-restrictive means such as candidate-residency requirements could achieve the same broader purpose. 836 F.3d at 1028. Similarly, in Arizona Green Party, we rejected the argument that the state must “adopt a system that is the most efficient possible” such that later deadlines could be set, in light of the “de minimis burden” imposed by the existing deadlines. 838 F.3d at 992. As the district court found, H.B. 2023 establishes a chain-of-custody for absentee ballots that furthers Arizona’s stated interests of reducing fraud and promoting public confidence, even though other, less restrictive, laws may. achieve the same broader purpose.
In sum, we conclude that the district court did not clearly err in finding that H.B. 2023 imposed a minimal burden on voters’ Fourteenth Amendment right to vote, in finding that Arizona asserted sufficiently weighty interests justifying the limitation, and in ultimately concluding that Feldman failed to establish that she was likely to succeed on the merits of her Fourteenth Amendment challenge.
3
We next consider Feldman’s First Amendment claim. According to Feldman, the district court undervalued the expressive significance of ballot collection when it concluded that she was unlikely to succeed on the merits of her First Amendment freedom of association claim, Feldman contends that through ballot collection, individuals and.organizations convey their support for the democratic process and for particular candidates and political parties. For example, declarant Ian Danley stated that his coalition, One Arizona, helps its “voters ensure that their voices are heard on Election Day” by “collecting and personally delivering their signed, sealed early ballots.” Similarly, declarant Rebekah Friend stated , that under H.B. 2023, the Arizona State Federation of Labor will have difficulty fulfilling its goal of encouraging its members to register and vote because it “will no longer be able to help its members or other voters vote by taking their signed, sealed early ballots to the Recorder’s office.” Therefore, Feldman argues, “ballot collectors convey that voting is important not only with their words but with their deeds,”
We first consider whether ballot collection is expressive conduct protected under the First Amendment. See Clark, 468 U.S. at 293 n.5, 104 S.Ct. 3065 (“[I]t is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies. To hold otherwise would be to create a rule that all conduct is presumptively expressive.”). We agree with the district court that it is not. Even if ballot collectors intend to communicate that voting is important, “[w]e cannot accept the view that an apparently limitless variety of conduct can be labeled ‘speech’ whenever the person engaging in the conduct intends thereby to express an idea.” United States v. O’Brien, 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Unlike burning an American flag or wearing a military medal, ballot collection does not convey a message that “would reasonably be understood by the viewer to be communicative.” Swisher, 811 F.3d at 311 (quoting Clark, 468 U.S. at 294, 104 S.Ct. 3065). Rather, a viewer *393 would reasonably understand ballot collection to be a means of facilitating voting, not a means of communicating a .message. See, e.g., Voting for Am., Inc. v. Steen, 732 F.3d 382, 392 (5th Cir. 2013) (concluding that collecting and delivering voter registration applications is “merely conduct” because “there is nothing inherently expressive” about it).
While political organizations undoubtedly engage in protected activities, ballot collection does not acquire First Amendment protection merely because it is carried out along with protected activities and speech. See Forum for Acad. & Institutional Rights, Inc., 547 U.S. at 66, 126 S.Ct. 1297 (concluding that “combining speech and conduct” is not enough to create expressive conduct); Voting for Am., 732 F.3d at 389 (“The Court also has repeatedly explained that non-expressive conduct does not acquire First Amendment protection whenever it is combined with another activity that involves protected speech”). Because H.B. 2023 regulates only third-party ballot collection, which is non-expressive conduct, the district court did not err in concluding that H.B. 2023 does not implicate the First Amendment.
Moreover, even if we assumed that H.B. 2023 implicates the First Amendment, we agree with the district court’s conclusion that Arizona’s regulatory interests in preventing voter fraud justifies the minimal burden that H.B. 2023 imposes on associational rights under the Anderson/Burdick test. Looking first at the burden imposed by H,B. 2023, the district court did not clearly err in finding that H.B. 2023 does not impose a severe burden. H.B. 2023 does not prevent individuals and organizations from encouraging others to vote, educating voters, helping voters register, helping voters, complete. their early ballots, providing transportation to voting sites or mailboxes, or promoting political candidates and parties. Ariz. Rev. Stat. § 16-1005; see, e.g., Timmons, 520 U.S. at 361, 117 S.Ct. 1364 (concluding that the burden a Minnesota law imposed on a political party’s First and Fourteenth Amendment rights was not severe because the party remained “free to endorse whom it likes, to ally itself with others, to nominate candidates for office, and to spread its message to all who will listen”). H.B. 2023 does not prevent individuals and organizations from associating “for the advancement of common political goals and ideas,” Timmons, 520 U.S. at 357, 117 S.Ct. 1364, or from “[banding] together in promoting among the electorate candidates who espouse their political views,” Cal. Democratic Party, 530 U.S. at 574, 120 S.Ct. 2402.
Turning to Arizona’s regulatory interests, we conclude for the reasons discussed supra at 389-90 that the district court did not clearly, err in finding that Arizona has important regulatory interests in preventing voter fraud and maintaining the integrity of the electoral process. Accordingly, the district court could properly conclude that Arizona’s important regulatory interests are sufficient to justify any minimal burden ón associational rights, as discussed supra at 391.
In sum, we conclude that ballot collection is not expressive conduct implicating the First Amendment, but even if it were, Arizona has an important regulatory interest justifying the minimal burden that H.B. 2023 imposes on freedom of association. The district court did not err in concluding that the Feldman was unlikely to succeed on the merits of her First Amendment claim.
IV
Having concluded that the district court did not err in holding that Feldman failed *394 to demonstrate a likelihood of success on the merits, we briefly consider the remaining equitable factors for issuing a preliminary injunction. Because it is not likely that Feldman will suffer a violation of her statutory or constitutional rights, she likely has “failed to establish that irreparable harm will flow from a failure to preliminarily enjoin defendants’ actions.” Hale v. Dep’t of Energy, 806 F.2d 910, 918 (9th Cir. 1986).
Even if Feldman had raised serious questions as to the merits of her claims, and also shown a likelihood of irreparable harm, Winter, 556 U.S. at 22, 129 S.Ct. 365, relief would not be warranted because Feldman has not shown that “the balance of hardships tips sharply” in her favor or that an injunction is in the public interest. All. for the Wild Rockies, 632 F.3d at 1135. This case is not one in which “qualified voters might be turned away from the polls.” Purcell, 549 U.S. at 4, 127 S.Ct. 5. Rather, it is one in which voters are precluded from giving their ballots to third-party ballot collectors and organizations must use an alternative means of mobilizing their voters. Cf. Lair, 697 F.3d at 1215 (the existence of “other options for engaging in political speech” militated in favor of staying an injunction against enforcement of a state law restricting one avenue of speech). Indeed, the district court found from the.evidence that many voters who entrust their ballots to collectors do so merely for convenience, and we cannot disturb this finding. See Hinkson, 585 F.3d at 1262 (noting our deference to findings that are plausible and supported by the record). The record does not establish that the organizational plaintiffs’ need, in light of H.B. 2023, to reallocate resources as part of a reconfigured get-out-the-vote effort constitutes a substantial hardship.
The impact of H.B. 2023 on prospective voters, which the district court found largely bo be inconvenience, does not outweigh the hardship on Arizona, which has a compelling interest in the enforcement of its duly enacted laws. See Nken v. Holder, 556 U.S. 418, 436, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009) (recognizing the public interest in the enforcement of the law); Veasey v. Perry, 769 F.3d at 895 (“When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws.”). As a general matter, Arizona’s regulation of the early voting process advances its interest in preserving ballot secrecy and preventing “undue influence, fraud, ballot tampering, and voter intimidation.” Miller, 179 Ariz. at 180, 877 P.2d 277. The interest in preventing fraud is “compelling,” Purcell, 549 U.S. at 4, 127 S.Ct. 5, and for Arizona no less than for Feldman, there are no “do over” elections; “the State cannot run the election over again” with the tools H.B. 2023 provides to combat possible fraud. Veasey v. Perry, 769 F.3d at 896. On this record, then, the balance cannot be said to tip “sharply” in Feldman’s favor. All. for the Wild Rockies, 632 F.3d at 1135.
We turn finally to the public interest, an inquiry that “primarily addresses impact on non-parties,” Bernhardt v. Los Angeles County, 339 F.3d 920, 931 (9th Cir. 2003), but that closely tracks Arizona’s own interests, see Nken, 556 U.S. at 435, 129 S.Ct. 1749. Like Arizona itself, its citizens “have a deep interest in fair elections.” Lair, 697 F.3d at 1215. Even in the absence of actual fraud, the prospect of early voting fraud may undermine public confidence in the results of the election. Purcell, 549 U.S. at 4, 127 S.Ct. 5. At the very least, H.B. 2023 assists in exorcizing the specter of illegitimacy that may hang over the electoral process in the minds of some citizens. *395 “Given the deep public interest in honest and fair elections” as well as the “numerous available options” for voters to submit ballots in Arizona consistent with H.B. 2023, Lair, 697 F.3d at 1215, removing H.B. 2023 from the State’s regulatory toolbox in the middle of the voting period may well do more harm to the perceived integrity and legitimacy of the election than good.
Feldman is therefore not only unlikely to prevail on the merits, but,'as the district court concluded, her 'interest in avoiding possible irreparable harm does not outweigh Arizona’s and the public’s mutual interests in the enforcement of H.B. 2023 pending final resolution of this case. In reaching this conclusion, we heed the "Supreme Court’s admonition to consider the harms “specific to election cases,” Purcell, 549 U.S. at 4, 127 S.Ct. 5, attendant on enjoining the enforcement of a state’s voting law while it is currently in play, and just weeks before an election.
AFFIRMED.

. Meaningful review of H.B. 2023 is especial- . ly important because, as I observed in my dissent, the sponsors of H.B. 2023 could not identify a single example of voter fraud in Arizona caused by ballot collection, nor is there one to be found anywhere in the voluminous record before us. Judge Bybee cites to a 2005 report from the bi-partisan Commission on Federal Election Reform, which recommends that states should reduce the risks of fraud and abusé in absentee voting by prohibiting "third-party” organizations from handling absentee ballots. Bybee Dissent at 415-16. However, the Commission’s recommendation was issued before the Supreme Court invalidated the § 5 preclearance requirement; since that time, the voting rights landscape has changed considerably, requiring courts to exercise more vigilance as the primary bulwarks against voter suppression.

.The appellants here (plaintiffs below) are Leslie Feldman, .Luz Magallanes, Mercedez Hymes, Julio Morera, and Cleo Ovalle, registered Democratic voters in Maricopa County, Arizona; Peterson Zah, former Chairman and First President of the Navajo Nation and registered voter in Apache County, Arizona; the Democratic National Committee;, the DSCC, aka Democratic Senatorial Campaign Committee; the Arizona Democratic Party; a com- - mittee supporting the election of Democratic United States Representative Ann Kirkpatrick to U.S. Senate; and Hillary for America, a committee supporting the election of Hillary Clinton as President of the United States. The intervenor-plaintiff/appellant is Bernie 2016, Inc., a committee supporting the election of Bernie Sanders as President of the United States. For convenience, we refer to the appellants as "Feldman.”

. Because H.B. 2023 is a state law, the challenge technically arises under the Fourteenth Amendment, which applies the First Amendment’s protections against States and municipalities. See City of Ladue v. Gilleo, 512 U.S. 43, 45 & n.1, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994).

. A "qualified elector” is any person at least eighteen years of age on or before the date of the election "who is properly registered to vote.” Ariz. Rev. Stat. § 16-121(A).

. The appellees here (defendants below) are the Arizona Secretary of State's Office; Arizona Secretary of State Michele Reagan in her official capacity; the Maricopa County Board of Supervisors; members of the Mari-copa County Board of Supervisors Denny Barney, Steve Chucri, Andy Kunaselc, Clint Hickman, and Steve Gallardo in their official capacities; the Maricopa County Recorder and Elections Department; Maricopa County Recorder Helen Purcell and Maricopa County Elections Director Karen Osbourne in their official capacities; and Arizona Attorney General Mark Brnovich in his official capacity. The intervenor-defendanl/appellee is the Arizona Republican Party, For convenience, we refer to the appellees as "Arizona/' where , appropriate, and otherwise use their individual names.

. In addition to this appeal, Feldman appealed another of the district court’s orders denying a separate motion to enjoin preliminarily other election practices challenged in the complaint. That appeal has similarly been expedited and will be the subject of a separate disposition. See Feldman v. Arizona Sec'y of State’s Office, No. 16-16865, 842 F.3d 613, 2016 WL 6472060 (9th Cir. 2016).

. The dissent suggests that the district court's factual findings are entitled to less weight here because "the district court did not conduct any evidentiary hearings to resolve disputed factual issues” and "the parties’ submissions were by affidavit.” See Dissent at 396 n.l. Our review of factual findings, however, does not change based on the nature of the evidence. "Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous.” Fed. R. Civ. P. 52(a)(6); see also Anderson v. City of Bessemer City, 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. This is so even when the district court’s findings do not rest on credibility determinations, but are based instead on physical or documentary evidence and inferences from other facts.” (citations omitted)). It is immaterial that the fact-finding occurred here at the preliminary' injunction stage; Rule 52(a)(6) by its terms applies-to all findings of fact, which necessarily includes the findings of fact that "the court must ... state” to support denial of an interlocutory injunction, see Fed. R. Civ. P. 52(a)(2). See Anderson, 470 U.S. at 574, 105 S.Ct. 1504 ("Rule 52(a) ‘does not make exceptions or purport to exclude certain categories of factual findings from the obligation of a court of appeals to accept a district court's findings unless clearly erroneous.' ” (quoting Pullman-Standard v. Swint, 456 U.S. 273, 287, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982))).

. Feldman does not raise the claim that H.B. 2023 is invalid because it was intended to suppress votes based on partisan affiliation or viewpoint, i.e., a theory of prohibited partisan fencing.

. The Fifteenth Amendment provides that *'[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude,” and authorizes Congress to enforce the provision "by appropriate legislation.” U.S. Const, amend. XV.

. As explained in Gingles, the relevant factors include:'
1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
5, the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
6, whether political campaigns have been characterized by overt or subtle racial appeals;
7, the extent to which members of the minority group have been elected to public office in thé jurisdiction.
Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are: whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group. whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.
478 U.S. at 36-37, 106 S.Ct. 2752 (internal quotation marks omitted). The Supreme Court has stated that another relevant factor is ‘‘[a] State's justification for its electoral system.” Houston Lawyers' Ass'n v. Attorney Gen. of Tex., 501 U.S. 419, 426-27, 111 S.Ct. 2376, 115 L.Ed.2d 379 (1991).

. Vote dilution can occur, for instance, where a practice has the effect of reducing or nullifying "minority voters' ability, as a group, to elect the candidate of their choice,” Shaw, 509 U.S. at 641, 113 S.Ct. 2816 (internal quotation marks omitted), and typically involves different arguments and evidence than in vote denial claims. For instance, Gin-gles explained that to prove that use of multi-member districts gives minorities less opportunity to elect representatives of their choice in violation of § 2, a plaintiff would generally have to demonstrate: (1) that the minority group at issue is both "sufficiently large and geographically compact to constitute a majority in a single-member district” and "politically cohesive,” and (2) that "the white majority votes sufficiently as a bloc to enable it — in the absence of special circumstances, such as the minority candidate running unopposed— usually to defeat the minority’s preferred candidate.”. 478 U.S. at 50-51, 106 S.Ct. 2752 (citations omitted). Such evidence would generally not be applicable to a claim that a specific practice unequally burdens the right to participate in the political process (a vote denial claim).

. The dissent does not dispute that under Gonzalez, the ultimate question is one of fact. Dissent at 396 n.l. Yet, the dissent argues that the district court’s assessment of the likelihood of success on the merits of this ultimate question should be reviewed de novo because we are at the preliminary injunction stage, and the question is a mixed question of law and fact. See id. at 396 n.1. We disagree. Our conclusion that the clear error standard applies in reviewing a trial, court's determination at the merits stage is equally applicable at thé preliminary injunction stage. See, e.g., Pom Wonderful LLC v, Hubbard, 775 F.3d 1118, 1123 (9th Cir. 2014) (holding, in an appeal from an order denying a motion for a preliminary injunction, that the clear error standard applies to the district court’s determination concerning likelihood of confusion, a mixed question of law and fact, because we had previously held that this standard was applicable to such determinations at the merits stage).

. Feldman contends that her failure to adduce evidence that ballot collection restrictions place a heavier burden on minorities than non-minorities should be excused because Arizona failed to track how early ballots are returned. As plaintiff, however, Feldman has the obligation of carrying her burden of proof. See Gingles, 478 U.S. at 46, 106 S.Ct. 2752. Moreover, the record indicates that Feldman had equal ability to generate the - required data. Early ballots have been collected in Arizona since at least 2002, and surveys could have determined the racial composition of voters who rely on others to collect their early ballot in Arizona. Moreover, the Arizona Democratic Party admits that collecting early votes has been an "integral part of the Arizona Democratic Party’s get-out-the-vote strategy” since at least 2002, Neither the Arizona Democratic Party nor any other organizational plaintiff has explained why it could not have compiled data on the race of the voters utilizing ballot collection given that the organizations collecting ballots appear to be .in the best position to gather such information.

. The dissent appears to conflate the district court’s rule that quantitative data is necessary to establish the first prong of a § 2 violation with a rule that only actual post-election voting data can establish a § 2 violation. Dissent at 401-02, While .the Third Circuit has suggested that plaintiffs must prove that a challenged practice has an impact on minority voter turnout, see Ortiz v. City of Phila. Office of City Comm’rs Voter Registration Div., 28 F.3d 306, 314 (3d Cir. 1994), the district court did not do so, and other circuits have evaluated pre-election challenges by considering statistical evidence regarding voting registration, voter turnout in prior elections, Ohio Democratic Party, 834. F.3d at 638-40, and the possession of qualifying voter ID, Veasey v. Abbott, 830 F.3d at 250.

. Feldman relies on two out-of-circuit vote dilution cases to support her argument that statistical evidence is not required in the application of the factors laid out in Gingles. See, e.g., Sanchez v. Colorado, 97 F.3d 1303, 1320-21 (10th Cir. 1996); Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ., 4 F.3d 1103, 1126 (3d Cir. 1993). But these cases indicate only that when minority voters claim that racial bloc voting will defeat their opportunity to elect a candidate of their choice, they may rely on a range of evidence to prove that a particular candidate is the preferred minority candidate. See Sanchez, 97 F.3d at 1320-21; Jenkins, 4 F.3d at 1126. Neither case addresses the evidence required to show that a practice results in protected minorities having less opportunity to participate in the political process than non-minorities. See League of Women Voters of N.C., 769 F.3d at 240; Veasey v. Abbott, 830 F.3d at 244. As noted supra n.10, different evidence may be required to prove a vote denial claim than to prove a vote dilution claim.

. For instance, Declarant Randy Parraz stated that his organization, Citizens for a Better Arizona, "focuse[s] its get-out-the-vote efforts on helping low-income Latino voters.” Ian Danley’s declaration states that his non-partisan organization, One Arizona, typically engages with voters in neighborhoods that are heavily Latino. Declarants Joseph Larios and Ken Chapman work for the Center for Neighborhood Leadership, which focuses its efforts in "low-income African American and Latino neighborhoods.” The Arizona Democratic lawmakers who provided declarations represent constituents who are predominately ethnic minorities. For example, Representative Ruben Gallego "represent^] approximately 763,000 constituents, nearly 80% of whom are ethnic minorities.” State Senator Martin Quezada "represent[s] approximately 213,000 constituents, nearly 80% of which are ethnic minorities." Kate Gallego, the Vice Mayor of the City of Phoenix, represents a district that "is heavily Latino and has the highest percentage — 15%—of African Americans in any district in Phoenix.”

. The dissent emphasizes that the evidence regarding the lack of mail delivery service to the Tohono O'odham Nation and the rural communities of Somerton and San Luis was not contested. Dissent at 403-04. But the issue is not whether minority voters have limited access to mail delivery service; rather, the issue is whether due to H.B. 2023, minorities "have less opportunity than other members of the electorate to participate in the'political process and to elect representatives of their choice.” 52 U.S.C. § 10301(b) (emphasis added). Without evidence regarding non-minorities, the comparison required by § 2 cannot be made.

. At the time of S.B. 1412’s enactment, Arizona was still subject to Section 5 of the Voting Rights Act, which required Arizona to receive preclearance from the Department of Justice or a federal court convened in the United States District Court for the District of *384 Columbia before implementing a new voting standard, practice, or procedure. 52 U.S.C. § 10304. The Arizona Attorney General submitted S.B. 1412 to the Department of Justice for preclearance. The Department of Justice requested additional information about S.B. 1412’s ballot collection restrictions, but did not complete its evaluation of S.B, 1412 because the Arizona legislature repealed the ballot-collection measure as a part of an omnibus bill in 2012, .

.The dissent argues that once plaintiffs have established a burden on minority voters, a “burden of rejoinder" should be placed on the state. Dissent at 403-04. But § 2 requires more than merely showing a burden on minorities. It requires plaintiffs to establish that minorities “have less opportunity than other members of the electorate to participate in the political process.” 52 U.S.C. § 10301. We have held that it is not enough for the plaintiff to make “a bare statistical showing of disproportionate impact on a racial minority”; rather, “Section 2 plaintiffs must show a causal connection between the challenged voting practice and [a] prohibited discriminatory result.” Salt River, 109 F.3d at 595 (second emphasis added) (quoting Ortiz, 28 F.3d at 312); see also Fairley v. Hattiesburg, 584 F.3d 660, 669 (5th Cir. 2009) (“[T]he plaintiffs bear the burden of proof in a VRA case, .and any lack of record evidence on VRA violations is attributed to them.”).

. We likewise do not consider the nine factors set forth in Gingles, 478 U.S. at 36-37, 106 S.Ct. 2752.

. The dissent contends that "neither the plaintiffs ñor the defendants categorize the challenge to H.B. 2023 as a facial challenge.” Dissent at 399 n.3. However, “[t]he label is not what matters.” John Doe No. 1 v. Reed, 561 U.S. 186, 194, 130 S.Ct. 2811, 177 L.Ed.2d 493 (2010). Because Feldman's "claim and the relief that would follow — an injunction” barring Arizona from implementing and enforcing H.B. 2023 — "reach beyond the particular circumstances of these plaintiffs," id. it is properly characterized as a facial challenge.

. The dissent argues that because "80% of the electorate uses early absentee voting,” it "has transcended convenience and has become instead a practical necessity." Dissent at 398, In doing so, the dissent elides the distinction between early absentee voting in general and early absentee voting through third-party ballot collection, the only practice restricted by H.B. 2023. Feldman did not provide "concrete evidence,” Crawford, 553 U.S. at 201, 128 S.Ct. 1610, of the number of voters who rely on this practice.

. The dissent argues that "the state’s justification for the law was weak” because it "could not identify a single example of voter fraud caused by ballot collection.” Dissent at 398. But the record does contain evidence of improprieties, such as ballot collectors impersonating elections officials. Moreover, Arizona’s interest is not simply in preventing fraud, but also in promoting public confidence in the electoral system, and the record contains evidence from which the district court could properly conclude, as Feldman’s expert conceded, that absentee voting is particularly conducive to fraud. "[Ojccasional examples” of fraud — as documented in the Arizona Republic article cited by the dissent— "demonstrate that ... the risk of voter fraud [is] real,” Crawford, 553 U.S. at 195-96, 128 S.Ct. 1610. Courts, wisely, do not require "that a State’s political system, sustain some level of damage” before allowing “the legislature [to] take corrective action.” Munro, 479 U.S. at 195, 107 S.Ct. 533.